STATE of Minnesota, Respondent,

v.

Gail Irma ANDERSEN, Appellant.

No. C6–84–1307.

Court of Appeals of Minnesota.

July 2, 1985.

654

Hubert H. Humphrey, III, Atty. Gen., R. Kathleen Morris, R. Gehl Tucker, Scott Co. Attys., Shakopee, for respondent.

Dennis P. Moriarty, Lee Vickerman, Shakopee, for appellant.

Heard, considered and decided by SEDG-WICK, P.J., and WOZNIAK and RANDALL, JJ.

## OPINION

WOZNIAK, Judge.

Following a jury trial in Carver County District Court, Gail Andersen was convicted of two counts of misconduct of a public officer under Minn.Stat. § 609.43(2) (1984). On appeal, Andersen contends (a) that one of the three indictments which Andersen was charged with was invalid; (b) that the trial court improperly consolidated the three indictments; (c) that Minn.Stat. § 609.43(2) is unconstitutionally vague and overbroad as applied to her case; (d) that the evidence was insufficient to support her convictions; and (e) that the trial court made three erroneous and prejudicial rulings at trial. We affirm.

## FACTS

*Procedural History*

In 1980, appellant Gail Andersen was elected to a four-year term as the mayor of Jordan, Minnesota.

On November 15, 1982, Barbara and Tom Sames appeared before the Jordan City Council and accused Mayor Andersen of harassment. The Jordan City Council voted to have the Jordan Police Department investigate the matter. In a formal resolution dated February 7, 1983, the Jordan City Council transferred the investigation and prosecution of the complaints against Andersen to the Scott County Attorney.

On April 12, 1983, after two days of testimony, a Scott County grand jury returned five indictments against Andersen. Subsequently, the five indictments were dismissed on the basis that they lacked specificity. The same grand jury was reconvened on August 4, 1983. One witness, Scott County Deputy Michael Busch, appeared before the grand jury and recapped the testimony that he had given at the first grand jury hearing. On that day, the grand jury returned three indictments against Andersen. Those three indictments included thirteen counts—eight counts of misconduct of a public officer and five counts of disorderly conduct. The indictments arose out of three separate in-

cidents. The parties have labeled these incidents as the Jordan Government Center incident, the Sames incident, and the Red Owl incident.

In the trial court's pretrial order, it granted the State's motion to consolidate the three indictments and granted Andersen's motion to change venue to Carver County.

A jury trial was held in Carver County. After the State submitted its case-in-chief, the trial court dismissed nine of the thirteen counts which were pending against Andersen. The four remaining counts went to the jury. Two counts charged Andersen with violating Minn.Stat. § 609.-43(2); the other two counts charged her with violating section 609.43(3).

Minn.Stat. § 609.43(2) and (3) (1984) provide:

A public officer * * * who does any of the following, for which no other sentence is specifically provided by law, may be sentenced to imprisonment for not more than one year or to payment of a fine of not more than $3,000, or both:

* * * * * *

(2) In his capacity as such officer * * does an act which he knows is in excess of his lawful authority or which he knows he is forbidden by law to do in his official capacity; or

(3) Under pretense or color of official authority intentionally and unlawfully injures another in his person, property or rights * * *.

*Id.*

The jury found Andersen guilty of two counts of misconduct of a public officer in violation of Minn.Stat. § 609.43(2), and not guilty of two counts under Minn.Stat. § 609.43(3).

The trial court denied Andersen's motion for an order vacating the verdict or, in the alternative, a new trial.

Andersen was sentenced to two years probation and fined $750.

*The Facts Underlying the Indictments*

Andersen's convictions arise only from the Sames incident. For purposes of this appeal, however, it is important to know the facts of both the Jordan Government Center incident and the Red Owl incident.

The Sames incident took place on October 29, 1982. Andersen was found guilty of one count of official misconduct arising from this incident. On October 29, 1982, Barbara Sames was moving her family from an apartment in Jordan to a duplex (which was subsidized housing) about one-half of a block away from the apartment. Both places were near Lagoon Park. Around noon, she drove through Lagoon Park at least three times while she was doing errands. The last time she drove through the park she noticed a black LTD and she recognized Andersen in the car. She was familiar with her and she knew she was the mayor of Jordan. As she drove through the park, she waved at a friend of hers.

Andersen was in the park with her elderly mother. (The park is referred to as "pot point.") Andersen suspected an illegal drug sale was taking place. She observed a suspicious young man around one of the park buildings and she saw a few of the same cars repeatedly drive through the park. She wrote down approximately five of the license plate numbers from these cars. As she was leaving the park, she followed Sames' car back to the Sames' apartment. At that point, Andersen recognized Barbara Sames.

Andersen then dropped her mother off at the house that they shared. She switched cars and drove her red pickup truck over to the Jordan Police Department. She told Police Chief Alvin Erickson about her suspicions of an illegal drug sale and she gave Chief Erickson her list of license plate numbers. They talked about the Sameses. There had been some complaints about their involvement with illegal drugs, but none of the complaints were ever formal.

Andersen then drove back to the park to see if the police were following up on the information which she had provided.

Sames was outside at the new duplex unpacking boxes and she observed Andersen drive by very slowly in her red pickup truck and stare at her. After Andersen had driven a short distance past the Sameses' new residence, she backed up and stopped in front of the Sameses' residence. Sames approached Andersen's truck.

Sames' testimony about the conversation that then took place was as follows: Andersen began to accuse her of dealing drugs. Andersen was very upset and spoke loudly. Andersen questioned Sames about why she had driven through the park three times and whom she had waved at. Andersen said that people complained to her about the Sameses and that there were rumors that she had been dealing dope. When Sames responded with a comment about small town rumors, Andersen asked Sames why she did not move out of town if she didn't like it. Andersen also made derogatory comments about the Sameses collecting welfare and living in subsidized housing. At that point, Chief Erickson approached the Sameses' residence in his squad car and Andersen drove away after she told Sames that she better get a lawyer.

Andersen testified that she stopped in front of the Sameses' new residence because she knew that Sames had seen Andersen follow her out of the park and she thought that Sames was probably curious about what she was doing. She testified that she expressed her concerns about illegal drug sales to Sames. She denied that she accused the Sameses of selling illegal drugs. She testified that she suggested to Sames that she move out of town only after Sames complained about how the people in Jordan held a low opinion of her. She testified that the conversation was not loud.

Sames' mother was standing near the Sames' garage when the conversation between Sames and Andersen occurred. She testified that she could not hear the specific words of their conversation, but she could hear their voices and Andersen's voice was loud and agitated.

Later that same day, a few of Sames' relatives went to Andersen's antique shop in Jordan and there was a heated discussion between the relatives and Andersen. There is conflicting evidence about this conversation. The relatives testified that Andersen reiterated her accusations that Sames was selling drugs and her desire that the Sameses leave town. Andersen testified that when the relatives arrived at her shop she asked them to leave several times and she told them that she did not want to discuss the matter. She further testified that she did not tell the relatives that Sames was selling drugs. No charges arose out of this conversation.

Subsequently, the Sameses filed a complaint with the Jordan Police Department and attended the November 15, 1982 Jordan City Council meeting where they accused Andersen of harassment.

The Government Center incident occurred in the Jordan Government Center on November 1, 1982. The trial court dismissed all charges arising from this incident after the State's case-in-chief was finished. Chief Erickson testified that William Brooks and Harry Johnson (both city council members) were in his office discussing a city matter. Andersen entered Erickson's office and told Brooks and Johnson that they did not have any business talking to Erickson and that she wanted them to leave. Chief Erickson testified that Andersen was upset and she spoke loudly. Andersen then left and Erickson finished his conversation with Brooks and Johnson. On cross-examination, Erickson testified about police department regulations which provide that no one in the police department shall contact any city official on departmental problems except through regular channels. Under Jordan's city charter, Andersen was the chief executive officer and the head of the Jordan police department. The chain of command was supposed to flow through her. Andersen did not testify about this incident, since the trial court dismissed the charges arising from it and ruled that Andersen could not submit evi-

dence about this incident in her case-in-chief.

The next discussion is part of the Sames incident. It gave rise to two counts of misconduct of a public officer and Andersen was found guilty of one of these counts. On November 18, 1982, Jordan Police Officers Dean Johnson and Larry Norring were having supper in the deli at the Jordan Red Owl. Johnson was assigned to investigate the Sameses' complaint. He testified that while he and Norring were having supper, Andersen approached their table and sat down. She appeared upset. He testified that Andersen said it was ridiculous that the city council had ordered an investigation of the Sameses' complaint and she wanted the investigation stopped. She then told Johnson that she wanted him to go to the Sameses and tell them that the City of Jordan would investigate them if they did not drop their complaint against her. Officer Norring's testimony about this conversation was consistent with Johnson's. Andersen testified that she told Johnson and Norring that she felt the investigation was very trivial and that their time could be spent on more important things. She denied telling Johnson to stop the investigation and threaten the Sameses with an investigation.

The final incident which gave rise to charges against Andersen occurred on November 30, 1982 at the Jordan Red Owl. The trial court dismissed all charges arising from this incident after the State's case-in-chief was finished. On the morning of November 30, 1982, Brooks and Johnson (both city council members) were having coffee with Jordan Police Officer Roger Wolpern at the Jordan Red Owl deli. Brooks testified that Andersen approached them and loudly told them that they had no business talking to the police and that the police had better things to do than spend their time in restaurants. On cross-examination, Brooks testified about police regulations which prohibit members of the department from loitering in public places. Again, Andersen did not testify about this incident, because the trial court dismissed

the charges arising from it and ruled that Andersen could not submit evidence about this incident in her case-in-chief.

### ISSUES

1. Is one of appellant's convictions based on a defective indictment?

2. Did the trial court commit prejudicial error when it consolidated the indictments against appellant for trial?

3. Is Minn.Stat. § 609.43(2) unconstitutionally overbroad and vague as applied to the facts of this case?

4. Is the evidence sufficient to support appellant's convictions?

5. Did the trial court commit prejudicial error:

   a. by allowing evidence about how previous Jordan mayors performed their duties?

   b. by allowing *Spreigl* evidence?

   c. by not allowing appellant to submit evidence relating to charges dismissed after the prosecutor's case-in-chief was completed?

### ANALYSIS

#### I.

Andersen contends that this court should overturn her conviction for violating Minn. Stat. § 609.43(2) on November 18, 1982, because that conviction is based on a defective indictment. She argues that part of one of the indictments (specifically, the two counts which arose out of the November 18, 1982 conversation between Andersen and Officers Johnson and Norring) is defective.

The original grand jury indictment did not include any charges relating to the November 18, 1982 conversation. Accordingly, Andersen argues, a no-bill should have been returned on that incident pursuant to the trial court's subsequent order for filing a "no indictment report." Andersen contends that such a no-bill would have prevented the grand jury from including those two counts in its August 4 indict-

ments since there was no additional admissible evidence submitted at the August 4 grand jury hearing. The only testimony heard on August 4, 1983 was from Scott County Deputy Michael Busch and he merely recapped his testimony from the previous grand jury hearing. This testimony was insufficient by itself to indict Andersen for charges arising from the November 18, 1982 conversation.

The leading case dealing with revised indictments is *State v. Iosue*, 220 Minn. 283, 19 N.W.2d 735 (1945). In *Iosue*, the Minnesota Supreme Court stated that a grand jury has the power to base an indictment on testimony heard in a previous grand jury investigation. *Id.* at 288–89, 19 N.W.2d at 738. It is immaterial whether the previous investigation resulted in a nobill or an indictment. *Id.* All of the proceedings of a grand jury are incomplete until its final adjournment and, hence, the grand jury has the power to find another indictment upon the same evidence with the same or different counts. *Id.* at 291, 19 N.W.2d at 739 (quoting *State v. Ginsberg*, 167 Minn. 25, 30, 208 N.W. 177, 179 (1926)). The grand jury has this power when indictments are dismissed (as they were in this case) on the basis that they are defective. *Id.* at 292, 19 N.W.2d at 739.

■ Thus, even if a no-bill should have been filed on charges arising from the November 18, 1982 conversation, the grand jury could still indict Andersen for charges arising from that conversation at the August 4 grand jury hearing. Furthermore, the indictment could be based on evidence heard at the original grand jury hearing.

The grand jury proceedings in this case were proper and the three indictments were valid.

## II.

In the trial court's pretrial order, it granted the State's motion to consolidate the three indictments. Andersen contends that this consolidation was prejudicial error which requires a new trial.

Rule 17.03, subd. 4 of the Minnesota Rules of Criminal Procedure permits indictments to be consolidated and tried together if the offenses "could have been joined in a single indictment." If the offenses that Andersen was charged with arose from the same course of conduct, then those offenses could have been properly joined in a single indictment and, hence, properly consolidated. *See* Minn.R.Crim.P. 17.03, subd. 1; *State v. Conaway*, 319 N.W.2d 35, 42 (Minn.1982).

■ The comments to Rule 17.03, subd. 1 adopt the provisions of Minn.Stat. § 609.-035 (1984) for determining whether offenses arise from a single course of conduct. The approach used under Minn.Stat. § 609.035 for making this determination is to focus on the time and place of the alleged offenses and also to consider whether the segments of conduct involved were motivated by an effort to obtain a single criminal objective. *State v. Knight*, 260 N.W.2d 186, 187 (Minn.1977) (citing *State v. Johnson*, 273 Minn. 394, 405, 141 N.W.2d 517, 525 (1966)). This test involves an examination of all the facts and circumstances of the case. *State v. Banks*, 331 N.W.2d 491, 493 (Minn.1983).

■ While it is difficult for us to say that Andersen's alleged conduct was motivated by an effort to obtain a single criminal objective, the common thread running through the three incidents that are involved here supports the trial court's conclusion that the charged offenses arose from the same course of conduct. The charge common to all three indictments was that Andersen was illegally using her mayoral power and, while doing so, she also exhibited disorderly conduct. In addition, all three incidents occurred within a relatively short period of time and they all occurred in Jordan.

Even if joinder was improper in this case, it is unlikely that Andersen was prejudiced by the joint trial. The Minnesota Supreme Court has indicated that a technically improper joinder of offenses is not prejudicial if the offenses are so closely related that, at the trial of one charge, evidence concern-

ing the other offenses would have been admissible as relevant evidence or as *Spreigl* evidence. *See Conaway,* 319 N.W.2d at 42; *Knight,* 260 N.W.2d at 187.

Here, all three indictments related to the mayor's allegedly illegal use of mayoral authority or her allegedly disorderly conduct. At the trial of one indictment, evidence about the facts surrounding the other two indictments would have been admissible.. In fact, we think the trial court would have had great difficulty separating the testimony and evidence on the various incidents.

We note that we analyze the consolidation issue from a pretrial perspective. As it is, the trial court could not have anticipated the directed verdicts and the three indictments did satisfy the "joinder" test. The trial court did not commit prejudicial error by consolidating the three indictments.

## III.

Andersen argues that Minn.Stat. § 609.-43(2) is unconstitutionally vague and overbroad as applied to her case and, as a result, her convictions violate her First Amendment rights.

The relevant portion of Minn.Stat. § 609.-43(2) prohibits a public officer from, "[i]n his capacity as such [an] officer * * *, [doing] an act which he knows is in excess of his lawful authority or which he knows he is forbidden by law to do in his official capacity * * *."

### A. *Overbreadth challenge*

■ A statute is overbroad when its terms sweep too far and regulate conduct which must be permitted. *City of Mankato v. Fetchenhier,* 363 N.W.2d 76, 78 (Minn. Ct.App.1985) (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973)).

■ Initially, Andersen argues that her statements were not "acts" within the purview of Minn.Stat. § 609.43(2), and thus, the State's application of the statute to her was an overbroad one. What constitutes an "act" under the statute is not a constitutional issue; rather it is a factual issue which the jury resolved at trial.

The real overbreadth issue is whether section 609.43(2) punishes both protected and unprotected speech. Andersen argues that her statements (or "acts") are constitutionally protected speech because she did not follow through with action on any of them. In other words, she merely spoke out, she did not carry out any threats or subvert any police investigation.

■ Threats of harm to others and coercive statements do not fall within the realm of protected speech. *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969); *Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument." *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. at 769. Threats and coercive statements play no part in furthering the purposes of the First Amendment which are to allow for the exposition of ideas and provide for uninhibited wide-open debate on public issues. *Id.; Watts,* 394 U.S. at 708, 89 S.Ct. at 1401. *See also* L. Tribe, American Constitutional Law § 12–8, at 605 (1978).

■ Andersen's alleged conduct clearly falls within the realm of unprotected speech. As mayor of Jordan, she allegedly accused a citizen of breaking the law, threatened a citizen with legal action, and attempted to interfere with a police investigation, as well as coerce a citizen into dropping a police complaint. Her alleged threats and attempt to interfere and coerce are not constitutionally protected simply because they took the form of words.

The overbreadth doctrine still allows Andersen to challenge section 609.43(2) as overbroad, even though her alleged conduct is unprotected and could be proscribed by a law that is drawn with the requisite

specificity, so long as section 609.43(2) reaches conduct protected by the First Amendment. *Fetchenhier*, 363 N.W.2d at 78 (citing *New York v. Ferber*, 458 U.S. 747, 767, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982)). If section 609.43(2), however, regulates conduct which is not protected by the First Amendment, Andersen cannot complain that the statute could conceivably be impermissibly applied to others. *Fetchenhier*, 363 N.W.2d at 78 (citing *Ferber*, 458 U.S. at 769, 102 S.Ct. at 3361).

■ Andersen has not identified any constitutionally protected conduct which section 609.43(2) purports to regulate. The requirement of section 609.43(2) that the penalized acts be either in excess of a public official's lawful authority or be illegal to do in a public official's capacity renders the statute inapplicable to constitutionally protected conduct. *See, e.g., People v. Kleffman*, 90 Ill.App.3d 1, 45 Ill.Dec. 475, 478, 412 N.E.2d 1057, 1060 (1980). Section 609.43(2) is not a statute where harmless expressions would come within its purview. *Cf. In re S.L.J.*, 263 N.W.2d 412 (Minn. 1978) (disorderly conduct statute punished both constitutionally protected and unprotected conduct).

■ Andersen's overbreadth challenge is unavailing since she has failed to show that section 609.43(2) could be applied to constitutionally protected conduct. *Fetchenhier*, 363 N.W.2d at 78.

### B. *Vagueness challenge*

■ Andersen may still bring a challenge under the related void-for-vagueness doctrine. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). When no constitutionally protected conduct is regulated by the statute, as is here, the statute must be judged in light of the conduct that is charged under the statute. *Id.* at 495 n. 7, 102 S.Ct. at 1191 n. 7; *State v. Becker*, 351 N.W.2d 923, 925 (Minn.1984). Hence, the court must examine Andersen's conduct to determine

if section 609.43(2) meets the "vagueness" test.

> The void-for-vagueness doctrine requires: [T]hat a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

*Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). The more important aspect of the vagueness doctrine is not actual notice, but the requirement that a legislature establish minimal guidelines to govern law enforcement. *Id.*

Andersen claims that she could not have known from the terms of section 609.43(2) that her conduct in the Sames incident was prohibited: the only evidence of the limits of her authority is the Jordan City Charter which gives her broad general powers, and there is no Minnesota penal statute which prohibits her from expressing her desire that someone get out of town nor is there a penal statute which prohibits her from telling a police officer to stop an investigation as long as she does nothing more than tell the police officer to stop.

The only troublesome part of section 609.43(2) is the requirement that a public officer must know either that her actions are in excess of her lawful authority or that the actions are illegal to do in her official capacity.

■ The term "lawful authority" derives its meaning from a set of rules not contained in the official misconduct statute. The statute, however, does not leave a judge or jury with unrestrained discretion to define a crime. The lawful authority of the public officers of this State is not so poorly defined that, as a general principle, public officials, judges and juries are unable to determine the propriety of a public officer's actions. *See, e.g., People v. Sims*, 108 Ill.App.3d 648, 64 Ill.Dec. 267, 270, 439 N.E.2d 518, 521 (1982); *State v. Florea*, 296 Or. 500, 677 P.2d 698, 700–01 (1984). *See also Thompson v. City of Minneapolis*, 300 N.W.2d 763, 769 (1980). Partic-

ularly, the "lawful authority" of the mayor of Jordan is not so poorly articulated as to leave any doubt that Andersen's alleged conduct exceeded that authority. No rational argument can be asserted that making threats and attempting to coerce police investigations falls within the scope of a mayor's "lawful authority."

In addition, actions are "forbidden by law" under section 609.43(2) in the generic sense. There does not have to be a particular penal statute which forbids Andersen's alleged conduct in order for her to be prosecuted under section 609.43(2). What was illegal for Andersen to do in her official capacity as mayor is not so indefinite that a legitimate argument can even be made that she could legally threaten a citizen of the town she governs and then seek to interfere with an investigation of her threats. The ordinary citizen could understand that section 609.43(2) clearly encompasses her alleged conduct. *See Fetchenhier*, 363 N.W.2d at 79. She could not have any reasonable doubt that her alleged actions were illegal or in excess of her mayoral authority. *See id.* at 79.

Furthermore, it appears that at trial she did know that the conduct she was accused of was in excess of her authority or illegal. *See State v. Tronca*, 84 Wis.2d 68, 267 N.W.2d 216, 224–25 (1978). Her defense at trial was that she did not make the alleged statements at all. She did not testify that she thought these statements, if she had made them, would have been legal. In fact, on cross-examination, she testified that it would have been improper for her to accuse someone of selling illegal drugs.

■ Andersen may have a valid claim that section 609.43(2) is phrased in general terms. These kinds of generalizations, however, are constitutional when greater specificity is impractical. *Thompson*, 300 N.W.2d at 769 (citing *Arnett v. Kennedy*, 416 U.S. 134, 161, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15 (1974)). Sometimes generalizations must be used in regulations which apply to an array of public employees because of the impracticality and difficulty of

phrasing the regulations more precisely. *Thompson*, 300 N.W.2d at 769.

■ Andersen's vagueness challenge fails because section 609.43(2) conveys a sufficiently definite warning as to the proscribed conduct.

■ In conclusion, it cannot be maintained that the First Amendment shields Andersen from prosecution based on her behavior which was disclosed at trial. The Constitution is an umbrella to protect the rights of all. To argue that this same umbrella, with its attendant safeguards, may be used as a shield to protect conduct and actions such as these would, indeed, emasculate its purpose. When an elected official accuses a citizen of breaking the law, threatens that citizen with legal action, and attempts to both interfere with police investigations and coerce a citizen into dropping a police complaint, that elected official commits a severe overreaching that strips citizens of their fundamental rights. Public employees, elected or non-elected, uniformed or non-uniformed, must not and cannot use their positions to intimidate, coerce, threaten, frighten or chill the rights of any individual citizen. "Freedom as we know it does not mean you have the privilege of trampling on the rights of others." *State v. Johnson*, 282 Minn. 153, 163 N.W.2d 750, 754 n. 3 (1968) (quoting an address given by then Minnesota Supreme Court Chief Justice Oscar R. Knutson).

## IV.

Andersen next contends that the evidence is insufficient to support her convictions for violating Minn.Stat. § 609.43(2).

In reviewing a claim of insufficiency of evidence, this court must interpret the evidence in the light most favorable to the verdict and assume that the jury believed the State's witnesses and disbelieved everything which contradicted their testimony. *State v. Vu*, 339 N.W.2d 892, 898 (Minn. 1983). If the jury, giving due regard to the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt, could reasonably have found

Andersen guilty, the verdict will not be upset. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984).

■ Viewing the evidence in the light most favorable to the State, the jury could have reasonably found that Andersen, in her capacity as mayor, knowingly committed an act in excess of her mayoral authority or knowingly committed an act which was illegal for her to do in her official capacity. The evidence is adequately sufficient to support her convictions.

## V.

Andersen next argues that the trial court committed three prejudicial errors at trial, any of which mandate a new trial.

### A. *Testimony regarding past mayoral practices*

During the trial, the trial court allowed testimony about how former mayors performed their duties under the Jordan City Charter and about how the mayor, city council, and police department worked together. At least one city council member and a former Jordan mayor testified about past mayoral practices. Their testimony indicated that past Jordan mayors have not been involved in the day-to-day operations of the Jordan police department; rather they have taken a less active administrative role. The former Jordan mayor, as well as Jordan Police Officer Dean Johnson, testified that they had discussed these past practices with Andersen before the Sames incident. All of this testimony was used to rebut Andersen's position that she had no knowledge that she acted beyond her mayoral authority and that she considered it was her duty to be actively involved in the operations of the police department.

Andersen claims that the evidence about past mayoral practices was irrelevant and immaterial since Jordan's mayoral authority stems from the Jordan City Charter, not from past mayors.

■ We disagree. The Jordan City Charter set forth the Jordan mayor's authority in broad terms. The State was required to prove that Andersen had knowingly exceeded her broadly-phrased authority. Testimony from witnesses who discussed the limits of mayoral authority with Andersen was relevant because it helped prove that Andersen knew the limits of her authority.

■ Rulings on evidentiary matters rest within the sound discretion of the trial court. *State v. Olkon*, 299 N.W.2d 89, 101 (Minn.1981), *cert. denied*, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). We do not find that the trial court abused its discretion here. The weight of this evidence was for the jury to consider.

### B. *Spreigl evidence*

Next, Andersen claims that the trial court erred in allowing the State to submit evidence about an incident which occurred at an auction in Hanover, Minnesota on October 22, 1981.

Both Donald Oudekerk and Andersen were at the auction. When they were loading up their purchases at the end of the day, Oudekerk noticed he was missing certain things that he had purchased. After his son said he thought he saw Andersen put them in her truck, Oudekerk approached her and asked her if she had put his things in her truck. She responded that she may have but she was in a hurry and did not have time to get the things out of her truck.

She gave Oudekerk her business card for her antique store in Jordan and told him to pick up his things there. He did not want to do this, so he kept asking her about his things and she kept repeating that she was the mayor of Jordan and she was in a hurry to get to an important meeting. Both became agitated. Andersen slapped Oudekerk and he fell to the ground. She attempted to leave, but the auctioneer detained her.

After Oudekerk's son called the police, a police officer arrived and took a statement. The police officer and Andersen went through her truck and gave Oudekerk back his things. Andersen repeatedly told the

police officer that she was the mayor of Jordan and she had an important meeting to get to. No complaint was filed on this incident.

The trial court ruled that evidence regarding the Hanover incident was admissible for purposes of proving Andersen's intent, knowledge, and modus operandi, as well as the absence of mistake. At her trial, Oudekerk, his son and the police officer who took the statement testified regarding the Hanover incident.

■ Rule 404(b) of the Minnesota Rules of Evidence provides that evidence of other wrongs is not admissible to prove character, but may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn.R.Evid. 404(b). In applying this rule, the "preferred approach" is to "analyze the evidence and determine if the evidence is relevant and material to the state's case, if the evidence of the defendant's participation in the offense is clear and convincing, and if the probative character of the evidence outweighs its potential for unfair prejudice." *State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983). In determining relevance and materiality, the trial court should consider the issues in the case, the reasons and need for the evidence, and whether there is a sufficiently close relationship between the charged offense and the *Spreigl* incident in time, place, or modus operandi. *State v. DeBaere*, 356 N.W.2d 301, 305 (Minn.1984). The decision whether to admit evidence of other crimes is largely within the discretion of the trial court. *State v. Campbell*, 367 N.W.2d 454 (Minn.1985) (citing *State v. Saucedo*, 294 Minn. 289, 293, 200 N.W.2d 37, 40 (1972)).

■ Here, it is uncontested that the Hanover incident was proven by clear and convincing evidence. The evidence was undoubtedly relevant and material to the State's case. The State had an arduous burden to prove that Andersen acted in her capacity as Jordan mayor or under the color of her office and that she had the requisite knowledge or intent. One of her primary defenses was that she did not have the requisite intent to be guilty of the charged offenses. The State had to produce evidence to rebut this defense. The evidence of the Hanover incident showed how she had attempted to use her position as mayor under circumstances similar to the incidents involved at trial and the incident took place just a few weeks before the other incidents. The evidence also showed how she behaved outside of Jordan where her authority as mayor clearly did not extend.

■ Finally, the trial court determined that the prejudicial effect of the *Spreigl* evidence did not outweigh its probative value in light of the State's substantial burden of proving intent and knowledge. This court cannot find that the trial court abused its discretion in making this determination.

## C. *Evidence concerning the dismissed nine counts*

After the State rested its case, the trial court dismissed nine of the thirteen counts with which Andersen was charged. At that time, she requested the trial court to either inform the jury of the dismissed counts before she presented her defense or allow her to submit evidence on the dismissed counts. The trial court denied both requests. The trial court determined that she could only submit evidence on the four remaining counts and that an instruction given before final arguments would prevent any confusion on the jury's part.

Subsequently, the defense submitted its case which consisted of Andersen's testimony. She testified only about the Sames incident. Before the attorneys began their final arguments, the trial court informed the jury that it had dismissed nine of the counts as a matter of law and that the jury was to consider only the remaining four charges. The trial court never told the jury that it was not to consider the evidence relating to the dismissed charges. During final arguments, Andersen's attorney argued that the State had miserably

failed to prove nine of the thirteen counts which it had claimed from the outset that it would prove.

She argues that the trial court's refusal to inform the jury of the nine dismissed counts before she submitted her defense denied her the right to offer a complete defense. She also argues that she was erroneously not allowed to rehabilitate herself after the State was allowed to attack her character as a result of the evidence submitted on the dismissed counts.

■ The trial court properly denied Andersen's request to submit testimony about the dismissed charges. "A judgment of acquittal, whether resulting from a jury verdict or ordered by the court, terminates the prosecution * * *." Wright, Federal Practice & Procedure: Criminal 2d § 468, at 667 (1982). The nine dismissed charges were no longer at issue and testimony about them would have been irrelevant.

■ We believe that the trial court should have informed the jury of the dismissed charges before Andersen put in her defense. While she was testifying, the jury should have known that two of the incidents were no longer at issue and that she was not permitted to testify about those two incidents. The jury undoubtedly expected her to testify about the Government Center and the Red Owl incidents and this expectation was not clearly addressed by the court or counsel.

While we consider that the court erroneously failed to inform the jury of the dismissed charges before Andersen submitted her defense, we find that the trial court did not commit prejudicial error. *See State v. Rono,* 324 N.W.2d 197, 199 (Minn.1982). The trial court gave more than adequate instructions to the jury during its charge so the jury was fully informed that it was to deliberate about only the four remaining counts. In addition, the record shows that Andersen's counsel argued, over the State's objection, the weakness of the remaining four counts in light of the State's failure to prove the nine other dismissed counts. Thus, Andersen did receive a tacti-

cal advantage resulting from the dismissals.

We conclude that the trial court did not commit any reversible error during Andersen's trial.

## DECISION

Andersen's convictions are based on valid indictments and the trial court properly consolidated the indictments for trial. Minn.Stat. § 609.43(2) is not unconstitutionally overbroad or vague. The evidence is sufficient to support Andersen's convictions and the trial court did not commit any prejudicial errors during Andersen's trial.

Affirmed.