**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-0260**

State of Minnesota,
Respondent,

vs.

Ricky Harry Gruber,
Appellant.

**Filed June 8, 2015**
**Affirmed**
**Ross, Judge**

Washington County District Court
File No. 82-CR-13-789

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Peter J. Orput, Washington County Attorney, Robin M. Wolpert, Assistant County Attorney, Stillwater, Minnesota (for respondent)

Maura E. Short, Kevin J. Short, Minneapolis, Minnesota (for appellant)

Considered and decided by Reilly, Presiding Judge; Ross, Judge; and Kirk, Judge.

**S Y L L A B U S**

Evidence in the form of scientific drug-identification laboratory testing is not necessary to prove the identity of commercially manufactured pharmaceutical drugs beyond a reasonable doubt in a prosecution for unlawful possession of legend drugs under Minnesota Statutes section 151.37, subdivision 1.

OPINION

**ROSS**, Judge

Deputy Sheriff Ricky Gruber secretly duplicated a key to the pharmaceutical deposit box at the sheriff's office where he worked, and a surveillance camera captured him sneaking in and using the key to open the box and pilfer discarded medicine. A jury found Gruber guilty of unlawful possession of legend drugs and misconduct by a public officer. Gruber asks us to reverse his convictions by holding that the district court should have suppressed evidence, that the state failed to provide him with notice of the officer-misconduct charge, that the jury did not receive sufficient evidence to prove that he was acting within his official capacity and that the medicines he stole are legend drugs, and that the district court received inadmissible evidence. We reject all of Gruber's arguments and affirm.

**FACTS**

The Washington County Sheriff's Office provides a locked depository box for members of the public to dispose of their unused pharmaceuticals. The sheriff maintains the box in a room not accessible to the general public. The deposited medicine accumulates in a 30-gallon drum inside the box until an assigned deputy unlocks the box, removes the drum, and incinerates the contents. Ideally, the depository program keeps discarded drugs from being obtained illegally.

One evening in January 2013 Sergeant Larry Osterman noticed that the door to the box was unlocked and the drum was missing. The circumstances might suggest that an authorized deputy had removed the drum and was incinerating the accumulated drugs.

But when the sergeant returned later, he found that someone had returned the drum partly full and relocked the box. This indicated that the drum had not been removed for disposal purposes, and it caused the sergeant to suspect that an unauthorized person had accessed it. He installed a hidden camera to monitor the room.

Within days the camera captured Deputy Sheriff Ricky Gruber unlocking and opening the locked box. It recorded Gruber removing the drum from the room and returning it minutes later. Gruber was assigned to a records-management project—an assignment that did not include accessing the deposited drugs. No one with authority had issued Gruber a key to the box or given him permission to open it. A week after Gruber was recorded accessing the box, supervisors who were watching a live feed from the camera saw him walk past the box more than once, peering around. They next watched Gruber approach the box, open it, remove the drum, and carry the drum from the room. A camera in another room picked up Gruber's activity. There Gruber rifled through the drum's contents, left the camera's view holding something in his hand, returned within view empty-handed, and took the drum back to the box.

The deputies confronted Gruber, arresting him.

Gruber cooperated. He made recorded statements after the investigator read him the *Miranda* warnings. He admitted that he took drugs from the drum on several occasions. He acknowledged that he was not supposed to access the box. He disclosed that he had removed a key from a coworker's desk, duplicated it, and returned it without notice. He admitted that he had taken the drugs for his own use and for use by his family. He knew that some of the drugs required a prescription, and he said that he had been

3

prescribed some of the same medicine. He revealed where the investigators would find drugs that he had taken, and he consented to searches of his office and his car. Investigating deputies searched and found amoxicillin, hydroxyzine, trazodone, lidocaine, metformin hydrochloride, tadalafil, vardenafil, and fluoxetine hydrochloride. They also found phentermine hydrochloride, a controlled substance. Gruber resigned his deputy position.

The state charged Gruber with fifth-degree possession of a controlled substance, Minn. Stat. § 152.025, subd. 2(a)(1) (2012), theft of a controlled substance, Minn. Stat. § 609.52, subd. 2(a)(1) (2012), misconduct by a public officer, Minn. Stat. § 609.43(2) (2012), and unlawful possession of legend drugs, Minn. Stat. § 151.37, subd. 1 (2012). "Legend drugs" are medications that require a prescription under federal law. Minn. Stat. § 151.01, subd. 17 (2012). One clause of the misconduct-of-a-public-officer statute criminalizes actions by a public officer done in his official capacity in excess of his lawful authority. Minn. Stat. § 609.43(2). The charging section of the criminal complaint against Gruber included the statutory language of this clause, but the complaint outlined the supporting facts only in its statement of probable cause.

Gruber pleaded not guilty. Before trial he argued that the deputies lacked probable cause for his arrest, and he moved the district court to suppress his statements and all drugs discovered in searches after the arrest. He also moved the court to dismiss the charge of misconduct by a public officer, contending that he was not acting in his official capacity when the thefts occurred. The district court denied these motions.

4

The parties submitted proposed jury instructions. The state's proposed instruction on the misconduct-by-a-public-officer charge defined the lawful authority that Gruber exceeded, describing his lawful authority as a peace officer's statutory authority to prevent and detect crime, to enforce criminal laws, and to arrest offenders. And the instruction identified Gruber's alleged misconduct as his accessing and taking drugs from the depository box without permission. The state maintained that the instruction was proper because Gruber had known that his theft-related behavior was the relevant misconduct as early as the pretrial motion to dismiss, when the parties debated whether Gruber committed the theft in his official capacity. The district court concluded that Gruber had sufficient notice of the charged misconduct and gave the instruction.

The jury found Gruber guilty of gross-misdemeanor misconduct by a public officer and misdemeanor possession of a legend drug. It acquitted him of the charges of possession and theft of controlled substances, both felonies. The jury explained in a note to the district court that it believed that Gruber had in fact committed theft, but it found that the state failed to prove that he knew that the substances he stole were controlled substances. Gruber moved to vacate the judgment, and the district court denied the motion.

Gruber appeals.

## ISSUES

I.     Did the deputies have probable cause to arrest Gruber?

II.    Did Gruber receive constitutionally sufficient notice of the charge of misconduct by a public officer?

5

III. Did the jury receive sufficient evidence to find that Gruber acted in his official capacity and exceeded his lawful authority when he accessed the pharmaceutical depository box and removed drugs without permission?

IV. Did the district court abuse its discretion by admitting into evidence portions of the Washington County Sheriff's Department Manual?

V. Did the district court abuse its discretion by refusing to strike Sergeant Osterman's testimony characterizing Gruber's acts as "wrong"?

VI. Did the state provide sufficient evidence to identify certain pills recovered from Gruber without offering evidence of chemical testing?

VII. Were the identified pills "legend drugs"?

## ANALYSIS

Gruber offers various bases for us to reverse his conviction. He maintains that the district court should have excluded all evidence collected after his arrest because the deputies lacked probable cause to arrest him. He maintains that he was improperly convicted of misconduct by a public officer because the criminal complaint did not allege any specific misconduct. He also argues that the state failed to introduce sufficient evidence to prove all the elements and that two evidentiary errors undermine the conviction on that count. And Gruber contends finally that the state failed to introduce sufficient evidence to prove that he possessed legend drugs because the state did not chemically test the drugs and expert testimony failed to prove that the drugs require a prescription. None of Gruber's arguments lead us to reverse.

## I

We are not convinced by Gruber's argument that deputies lacked probable cause to arrest him and that, because the arrest was illegal, the district court was bound to

6

suppress the resulting evidence. Gruber is correct that the federal and state constitutions protect persons from unreasonable warrantless searches and seizures. U.S. Const. amend. IV; Minn. Const. art. I, § 10. And it is true that evidence resulting from an unreasonable seizure must be excluded. *State v. Smith*, 814 N.W.2d 346, 350 (Minn. 2012). But police may arrest a person without a warrant if they have probable cause to believe that the person either already committed or was committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964). We review whether probable cause existed de novo. *State v. Milton*, 821 N.W.2d 789, 798 (Minn. 2012).

We are satisfied that the deputies had probable cause to arrest Gruber. Officers have probable cause to arrest if they know of objective facts or circumstances that would "lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the [suspected] person . . . is guilty of a crime." *State v. Carlson*, 267 N.W.2d 170, 173 (Minn. 1978); *see also Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 800 (2003) ("[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt." (quotation omitted)); Minn. Stat. § 629.34, subd. 1(a), (c)(5) (2014) (permitting warrantless arrest on probable cause for gross misdemeanor violations of the statute prohibiting theft). We assess probable cause by considering the totality of the circumstances. *State v. Burbach*, 706 N.W.2d 484, 488 (Minn. 2005). We will therefore consider what circumstances were known to the deputies before they arrested Gruber.

At the time the deputies arrested Gruber, they were aware of circumstances that would lead any reasonable person to strongly suspect that Gruber had either just committed a theft or attempted to commit a theft. Theft occurs when a person

7

"intentionally and without claim of right takes, uses, transfers, conceals or retains possession of movable property of another without the other's consent and with intent to deprive the owner permanently of possession of the property." Minn. Stat. § 609.52, subd. 2(a)(1). And a criminal attempt occurs when a person who intends to commit a crime takes a substantial step toward committing it. Minn. Stat. § 609.17, subd. 1 (2012). Immediately before Gruber's arrest, the arresting deputies knew that Gruber lacked authority to access the locked box and the pharmaceutical drum secured inside it. They knew that no one with authority had given Gruber a key to access the pharmaceuticals. They knew that about three weeks earlier someone secretly opened the box, removed the drum of pharmaceuticals, and later replaced the drum. They knew that a week before the arrest, Gruber unlocked the box, opened it, removed the drum, and returned the drum minutes later. And when they arrested Gruber, they had just watched him engaging in apparently criminal behavior: he had waited until late in the work day and entered the room where the pharmaceuticals are kept; he looked around several times; he unlocked and opened the box; he removed the 30-gallon drum of pharmaceuticals; he carried the drum to another room; he rummaged through the medications in the drum; he left the room carrying something in his hand; he returned to the room with nothing in his hand; and he replaced the drum in its original place. It is inconceivable from these circumstances that a reasonable police officer would *not* suspect Gruber of theft or attempted theft from the drug depository. Because probable cause supports the arrest, the district court correctly denied Gruber's motion to suppress the resulting evidence.

8

## II

Gruber also does not persuade us that the state violated his constitutional rights by failing to give him notice of the charge of misconduct by a public officer. The Constitution requires the state to inform a defendant of the "nature and cause of the accusation" against him. U.S. Const. amends. VI, XIV. The state meets this requirement "if the charging instrument contains such descriptions of the offense charged as will enable him to make his defense and to plead the judgment in bar of any further prosecution for the same crime." *State v. Chauvin*, 723 N.W.2d 20, 29–30 (Minn. 2006) (quotation omitted). The specificity required depends on whether the statute cited in the charge includes all elements of the charged offense. *State v. Oman*, 265 Minn. 277, 282–83, 121 N.W.2d 616, 620–21 (1963); *see, e.g.*, *State v. LaValla*, 278 Minn. 63, 66, 153 N.W.2d 135, 137 (1967) (requiring additional facts for a burglary charge because burglary can be committed in various ways). We review de novo whether a complaint sufficiently informed the appellant of the nature and cause of the accusations against him. *See State v. Bias*, 419 N.W.2d 480, 486 (Minn. 1988).

Gruber cites to three purported defects in the complaint. None compels reversal.

He first argues that the complaint failed to enumerate the relevant clause of Minnesota Statutes section 609.43. That statute enumerates four clauses, any one of which constitutes a crime. Gruber is correct that the complaint does not enumerate the relevant clause, but the objection is empty. Although the complaint does not enumerate the charged clause, it includes an almost verbatim recitation of the second clause, which establishes that a crime occurs when a police officer, "in the capacity of such officer or

9

employee, does an act knowing it is in excess of lawful authority or knowing it is forbidden by law to be done in that capacity." Minn. Stat. § 609.43(2). We therefore reject Gruber's contention that the complaint improperly failed to identify the charge against him.

Gruber argues second that the complaint failed to include an element of that offense because it did not cite any statute defining his "lawful authority" referred to in the charging clause. What is "lawful authority" under the second clause of section 609.43 depends on "statutes [that] define or describe a public official's authority," and an indictment under the clause must therefore allege that the officer exceeded a statutory limit on his authority. *State v. Serstock*, 402 N.W.2d 514, 517–19 (Minn. 1987). Gruber is correct that the criminal complaint cited no statute defining his allegedly exceeded lawful authority.

This was error. But identifying the error in the complaint does not end our analysis. We apply a harmless-error test if a complaint is inadequate. *Chauvin*, 723 N.W.2d at 30; *see also* Minn. R. Crim. P. 17.02, subd. 3 (indicating no reversal for non-prejudicial omission of citation). "Unless there is actual proof that defendant has in fact been misled as to the charge brought against him, to his prejudice, it is not ground for invalidating the conviction after a fair trial." *State v. Clark,* 270 Minn. 538, 552, 134 N.W.2d 857, 867 (1965). The record informs us that the error did not mislead Gruber or leave him to defend in the dark. The state identified a statutory definition of Gruber's authority as a peace officer in its proposed jury instructions ten days before Gruber's trial. And the pretrial litigation informs us that Gruber knew this basis of the claim before

the trial began. Also dispositive, he fails even to attempt to show how the complaint's omission prejudiced him.

Gruber contends third that the complaint failed to identify the factual basis for the charge because it did not specify the act constituting his offense. The parties agreed to a jury instruction setting out the alleged offending act as "entering a secured drug bin, examining the contents of the bin, and removing items from the bin." This agreement captures the essence of the conduct detailed in the complaint's statement of probable cause. And the complaint refers to no other possible course of offending conduct. Gruber's arguments supporting his pretrial motion confirm that he fully understood that the charge focused on his improperly accessing and stealing from the depository box. It is true that the charging section does not specify the misconduct and that the state before trial once identified the misconduct only as "theft or illegal possession of a controlled substance or legend drug." But the state is not limited to this recitation, particularly given the singular course of conduct involved in this case, the complaint's statement of probable cause, and the repeated pretrial references by both parties to Gruber's accessing the drum and taking drugs from it. The complaint sufficiently identified the factual basis for the charge. And even if it had not, again Gruber fails to express how the alleged lack of more particular notice hindered his defense. Because no prejudice arose from the alleged error, any error is at most harmless.

**III**

Gruber argues that the jury received insufficient evidence to find that he engaged in misconduct as a public officer. We thoroughly review the record to determine whether

the evidence supports the conviction. *State v. Thomas*, 590 N.W.2d 755, 757 (Minn. 1999). We will uphold the verdict if the evidence, viewed in the light most favorable to the verdict, would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Id*. at 757–58.

Gruber first says that the evidence does not prove that he exceeded his lawful authority. Gruber, a peace officer at the time of his offense, was "charged with the prevention and detection of crime and the enforcement of the general criminal laws of the state and [had] the full power of arrest." Minn. Stat. § 626.84, subd. 1(c)(1) (2012). Gruber admitted, and other witnesses confirmed, that he was not authorized to access the depository box. Because Gruber's law-enforcement authority and assigned duties did not include any role in the drug-disposal program and he was not authorized to access the depository box, a reasonable jury could find that his surreptitious access exceeded his lawful crime-fighting authority.

Gruber argues second that the state failed to prove that he was acting in his official capacity when he took the drugs. He emphasizes that his misconduct was not directly related to his assignment and occurred late in the day when few of his colleagues were working. He reasons that, because he lacked authority to enter the pharmaceutical box, he could not have accessed the box in his official capacity. But "official capacity" is a broader concept than statutory authority; it refers to all of a public employee's responsibilities in serving the public interest. *State v. Ford*, 397 N.W.2d 875, 879 (Minn. 1986). *Ford* is instructive. In *Ford*, the supreme court held that a teacher had been acting in his official capacity when he used "the authority of his position implicitly to persuade

12

[students] to acquiesce" to his sexual advances. *Id.* at 880. This holding contradicts Gruber's reasoning. Under Gruber's approach, we would deem all criminal behavior as falling outside of an official's "official capacity" because, presumably, no official's assignment includes engaging in crime. We of course reject this approach. Like the *Ford* defendant, Gruber used his official position of trust to accomplish his misconduct. He relied on his position to obtain a key, to access the room in the nonpublic area of the sheriff's office, and to enter the depository box on multiple occasions without notice. Gruber's various opportunities to access the box resulted only from his official position. The jury received sufficient evidence to find that Gruber acted in his official capacity when he accessed the box.

**IV**

Gruber argues unconvincingly that we should reverse because the district court improperly admitted documentary and testimonial evidence about five clauses of the sheriff's department policy manual. We review the district court's evidentiary rulings for abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003). Gruber argues that the evidence was irrelevant and confused the jury. Evidence is relevant if it tends to make a material fact more or less probable, and relevant evidence is generally admissible. Minn. R. Evid. 401, 402. The district court may in its discretion nevertheless exclude relevant evidence if its probative value is substantially outweighed by the risk of unfair prejudice or the risk of misleading the jury. Minn. R. Evid. 403. Gruber has the burden of showing error and resulting prejudice. *Amos*, 658 N.W.2d at 203.

Gruber fails to show error. He argues that the policy manual was irrelevant because the charge of misconduct by a public officer concerned only whether he exceeded his statutory authority, not whether he violated department policy. But the policy was relevant to prove Gruber's *mens rea* for the crime. The controlling statute establishes a crime only when a person "does an act *knowing* it is in excess of lawful authority." Minn. Stat. § 609.43(2) (emphasis added); *see also State v. Andersen*, 370 N.W.2d 653, 662 (Minn. App. 1985). Gruber's knowledge of his responsibilities, including those identified in the manual, was relevant to whether he knew that his acts exceeded his authority. The district court deemed the policy relevant on other grounds, which we need not address in light of our holding on this rationale.

Gruber contends that even if the manual was relevant, it had little probative value because he had already admitted to violating the department rules. He argues that the manual confused the jury by suggesting a violation of department policy would be enough to find him guilty. But the district court acted within its discretion by weighing the competing concerns under rule 403 and determining that, despite Gruber's stipulation of wrongdoing, the policy evidence was more probative than prejudicial. Gruber makes only a conclusory assertion of jury confusion, never explaining why the jury was likely confused. And even if the district court had improperly admitted the evidence, Gruber has failed to meet his burden of showing that the error affected the verdict. *See State v. Vang*, 774 N.W.2d 566, 576 (Minn. 2009).

The district court did not commit prejudicial error by allowing the jury to see the policy manual and allowing the prosecutor to question a witness about it.

## V

Gruber also argues that the district court abused its discretion by allowing the state to elicit testimony from Sergeant Osterman regarding what conduct officers are permitted to engage in. We do not accept Gruber's characterization that the sergeant effectively testified that Gruber was guilty of misconduct by a public officer. The record indicates that Sergeant Osterman did not declare Gruber's guilt; he instead testified that sworn police officers are not supposed to take controlled substances without a prescription or commit theft and that theft is wrong and against the law. He also testified that he was concerned that someone had taken and duplicated a key and that it was "obviously wrong" for anyone to do so.

Gruber argues that this testimony was not helpful and constituted improper opinion testimony involving legal analysis. He cites cases in which the supreme court held that expert testimony was inadmissible because it expressed an opinion about a defendant's *mens rea* or a witness's truthfulness. *See State v. Chambers*, 507 N.W.2d 237, 239 (Minn. 1993); *State v. Provost*, 490 N.W.2d 93, 102–03 (Minn. 1992); *State v. Saldana*, 324 N.W.2d 227, 231–32 (Minn. 1982). Those cases do not support his argument because the sergeant did not opine about Gruber's mental state or truthfulness. Courts may admit lay opinion testimony based on the witness's rational perceptions when the testimony helps the jury to understand a fact at issue. Minn. R. Evid. 701. Sergeant Osterman's testimony relates to material facts. Although the questioning did not elicit precise testimony, the sergeant's answers explained that deputies generally understand that certain acts are prohibited. Sergeant Osterman did not refer to Gruber's lawful

15

authority under section 609.43(2), and he never stated that Gruber's acts would violate that statute.

As to prejudice, the sergeant's testimony did not significantly affect the verdict. Even when testimony is inadmissible, we reverse only if "there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Post*, 512 N.W.2d 99, 102 n.2 (Minn. 1994). Gruber himself repeatedly described his actions as "wrong," in the same way that Sergeant Osterman did. The sergeant's testimony mirrored Gruber's own defense and unlikely influenced the jury any more than Gruber's own admissions.

## VI

Gruber argues that the state offered insufficient evidence that the medications he removed from the depository box were actually the "legend drugs" that the state alleged them to be. He argues that only by chemical testing could the state provide sufficient evidence allowing the jury to identify the drugs beyond a reasonable doubt.

We reject Gruber's legal proposition that scientific testing is always required to identify drugs beyond a reasonable doubt. Three supreme court cases inform this conclusion.

In the most recent case, *State v. Olhausen*, so-called "nonscientific" evidence was sufficient to identify drugs beyond a reasonable doubt. 681 N.W.2d 21, 27–29 (Minn. 2004). The *Olhausen* court held that the state did not need chemical testing to identify methamphetamine to prove the sale of methamphetamine after the defendant apparently destroyed the substance. *Id.* at 29. In that case, an experienced undercover buyer testified

16

that a package contained methamphetamine, relying on his brief observations before the seller fled with it. *Id*. at 24. The witness based his opinion entirely on the substance's packaging, rather than on any characteristic of the substance itself. *Id.* He even testified that the usual odor of methamphetamine was absent. *Id.* But he explained that placebos are rare, and he relayed the seller's representations that the substance was genuine. *Id.* at 29. This nonscientific evidence provided a sufficient basis to identify the substance and convict without chemical testing. *Id*.

We can counterbalance *Olhausen* with two other supreme court cases, both relied on by Gruber. In *State v. Robinson*, the court rejected the random-sampling method of testing for cocaine where the total weight of the cocaine was an essential element of the charged offense. 517 N.W.2d 336, 339 (Minn. 1994). But the *Robinson* court did not establish a chemical testing requirement in all drug cases. The court determined only the unreliability of randomly testing samples from several of many bags of alleged cocaine to find the identity of all the bags. *Id.* The court reasoned that the dubious nature of the substance—criminally mixed cocaine prepared in an industry known for artifice—made identification by sampling alone presumably unreliable. As that court put it, "The trouble with determining the required weight of a mixture by extrapolation from random samples is that the extrapolation does not take into account the fact that, in the case of substances not homogeneously packaged, drug dealers are known to substitute placebos for the real thing. Indeed, substitution is apparently common . . . ." *Id.* For that reason, the court held that scientifically testing only a sample of the drugs did not produce sufficient evidence to prove the identity of the whole. *Id.* at 339–40.

17

And in *State v. Vail*, the supreme court first deferred to the district court's fact-finding determination that the type of scientific testing in that case was not persuasive enough to prove the identity of the tested substance as marijuana. 274 N.W.2d 127, 133 (Minn. 1979). The *Vail* court was left to answer only whether the district court could find that the identity was proved by the other, nonscientific evidence offered to prove identity (the total weight of the substance sold, the sale price, and the defendant's claim that the substance was "Mexican grade" marijuana). *Id.* at 133–34. That evidence was held to be insufficient. *Id.* at 134. But if Gruber's contention were correct that testing is always required to prove the identity of drugs, the *Vail* court would have ended its analysis immediately after deferring to the district court's finding that the evidence of scientific testing was unconvincing. It did no such thing. Instead, the supreme court summarized what we are certain remains the controlling law: "We have not prescribed minimum evidentiary requirements in identification cases, preferring to examine the sufficiency of the evidence on a case-by-case basis." *Id.* In that case, the court considered the probative value of the nonscientific evidence and concluded that no reasonable jury could deem the obviously thin evidence sufficient proof that the substance was really marijuana. *Id.*

The relevant holdings inform us of the following principles: fact finders must consider and weigh the reliability of the state's chemical-identity evidence in each case; a fact finder can reject as unreliable a proffered method of scientific testing; a fact finder may determine identity of a drug beyond a reasonable doubt based on reliable nonscientific evidence; and when we address an appellant's claim of insufficient chemical-identity evidence, we will uphold the jury's chemical-identity fact findings

18

unless the findings are clearly erroneous. We therefore consider whether the evidence the state presented was sufficiently reliable for the jury to identify as "legend drugs" the drugs that Gruber stole from the depository.

The state showed the jury Gruber's stolen medicine—various pills. The pills that Gruber stole were generally kept in prescription bottles or were sealed in commercially marked blister packaging. The record informs us that the pills could be identified by their physical characteristics. Some were tablets and some were capsules. They were of various colors. They bore distinctive pharmaceutical designations in words, letters, numbers, or some combination of these. Each tablet of the allegedly legend drugs in one group had a "V" and certain numbers printed on it. Another group of these drugs bore the designation "TEVA" and specific numbers. The state's expert witness, Minnesota Bureau of Criminal Apprehension forensic scientist Sara Goldstrand, testified that she identified the pills using standard BCA identification procedures. She visually observed and noted the packaging of each item, opened each bottle, separated the pills based on appearance, and identified the pills by matching them against images in a professionally accepted pharmaceutical database. Goldstrand testified that the medication in sealed commercial packaging had not apparently been tampered with, so she relied on the labels to determine the contents. She scientifically assessed the phentermine hydrochloride tablets, testing one of them using gas chromatograph mass spectrometry, because that drug is a controlled substance. She also identified trazodone tablets, amoxicillin capsules, hydroxyzine capsules, fluoxetine (Prozac) capsules, and a tube containing lidocaine.

19

Another witness testified that sealed blister packages contained tadalafil tablets, metformin hydrochloride tablets, and vardenafil tablets.

We are satisfied that the jury had sufficient evidence from which to identify the legend drugs beyond a reasonable doubt. Unlike in *Robinson*, here the fact finder was not considering bundles of powder mixed by criminals in an unregulated industry where product integrity is always doubtful. And unlike in *Vail*, the fact finder here did not determine identity merely based on a market price and the optimistic assessment of the drug purchaser. Here the jury could see that the tablets and capsules are homogeneously manufactured; that they are uniformly shaped, colored, and marked specifically so they can be identified by professionals and nonprofessionals; and that they are commercially and uniformly marked, packaged, and labeled. The jury also heard from forensic technicians who identified the specific drugs using the same methods pharmacists use to identify drugs.

Federal and state courts around the country have taken the same approach, allowing drug identification by circumstances other than laboratory testing. *See Jones v. Commonwealth*, 331 S.W.3d 249, 253–54 (Ky. 2011) (collecting and discussing cases). We observe also that relying on visible characteristics of tablets and capsules to identify drugs is an approach apparently endorsed by federal agencies most responsible for regulating drugs. Specifically, the United States National Library of Medicine and the Food and Drug Administration both offer services to assist the public in identifying medications by imprint, shape, color, and size. Nat'l Library of Med., *Pillbox*, http://pillbox.nlm.nih.gov/pillimage/search.php; FDA, *Drug Identification*,

20

http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm082695; *see also* FDA, Ctr. for Drug Evaluation & Research, *Safety Considerations for Product Design to Minimize Medication Errors* (2012) (draft guidance).

The matching evidence alone may have been sufficient to convince a jury of the identity of the drugs beyond a reasonable doubt. The state also corroborated this direct identification evidence with two forms of circumstantial evidence. The first is the reason for the drugs' presence in the sheriff's office. They arrived through a program specifically designed for the public to deposit prescription drugs. And the second is Gruber's own conduct in collecting and using the drugs. The jury saw a recording of Gruber's post-arrest interview in which he stated that he had removed from the depository three specific drugs: amoxicillin, hydroxy (he could not fully recall this substance's name), and lidocaine, which he said he took intending to consume them or to provide them to members of his family to consume. In other words, the jury learned that Gruber had personal experience with these drugs and that he so trusted the accuracy of his own identification of them that he would ingest them himself or supply them to his family members.

We hold that in a prosecution for unlawful possession of legend drugs under Minnesota Statutes section 151.37, subdivision 1, laboratory testing is not essential to identify the drugs beyond a reasonable doubt when reliable nonscientific evidence exists. And we hold that this sort of reliable evidence supports the verdict here.

## VII

Gruber contends that even if the state identified the drugs, it did not prove that they are legend drugs because the record lacks evidence that the drugs had been prescribed. Again, "legend drugs" are medications that, under federal law, may be dispensed only by prescription. Minn. Stat. § 151.01, subd. 17 (2012). Gruber accurately indicates that the state's expert witnesses did not testify that all of the charged legend drugs require a prescription. But this testimony was unnecessary. Whether an identified drug requires a prescription is not a fact question; it is a legal question. Drugs requiring a prescription under federal law include drugs limited by an approved application under section 505 of the Federal Food, Drug, and Cosmetic Act to "use under the professional supervision of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1) (2012). The U.S. Department of Health and Human Services publishes and updates a list of all approved drugs. 21 U.S.C. § 355(j)(7)(A) (2011); *see also* 21 C.F.R. § 314.105(a) (2008) (making approval of a new drug application effective when the FDA issues an approval letter). The department's publication classifies drugs according to whether they are approved for use only with a prescription. FDA, *Approved Drug Products with Therapeutic Equivalence Evaluations ("Orange Book")* at vi (2015). And the list identifies as prescription drugs all six of the medications included in Gruber's possession-of-legend-drugs charge, and all of them were introduced into evidence. *Id.* at 3-24–25 (amoxicillin), 3-190–91 (hydroxyzine), 3-235–36 (metformin hydrochloride), 3-336 (tadalafil), 3-354 (trazodone), 3-361 (vardenafil). The district court did not err by

determining as a matter of law that the identified substances that Gruber possessed are prescription drugs.

## D E C I S I O N

Police had probable cause to arrest Gruber for theft or attempted theft. Gruber was not prejudiced by any notice deficiency in the complaint charging him with misconduct by a public officer. The district court's evidentiary decisions were within its appropriate discretion. And the state provided sufficient evidence for the jury to identify the drugs beyond any reasonable doubt.

**Affirmed.**