**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1645**

State of Minnesota,
Respondent,

vs.

Donald Joseph Hall, Jr.,
Appellant.

**Filed December 5, 2016
Affirmed
Jesson, Judge**

Lac Qui Parle County District Court
File No. 37-CR-14-191

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, Minnesota; and

Richard G. Stulz, Lac Qui Parle County Attorney, Madison, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Anders Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Jesson, Presiding Judge; Stauber, Judge; and Reyes, Judge.

### S Y L L A B U S

Minnesota Statutes section 609.749, subdivision 2(4) (2014), which defines stalking to include repeatedly making telephone calls, is not unconstitutionally overbroad on its face or as applied in violation of the First Amendment to the United States Constitution.

## OPINION

**JESSON**, Judge

Appellant Donald Joseph Hall challenges his conviction of stalking under Minnesota Statutes section 609.749, subdivision 2(4), which defines stalking as repeatedly making phone calls, sending text messages, or inducing a victim to make phone calls, whether or not conversation ensues. Hall argues that this portion of the stalking statute is unconstitutionally overbroad in violation of the First Amendment. He also argues that there is insufficient evidence to support his conviction. Because subdivision 2(4) is neither unconstitutionally overbroad on its face nor as applied to Hall, and because there is sufficient evidence to support his conviction of stalking, we affirm.

## FACTS

According to testimony at trial, Hall and the victim, B.R., both lived in a small town in greater Minnesota. B.R. was the city clerk and treasurer who, among other duties, managed the billing for residential utilities. The two knew each other. When Hall initially moved into town, B.R. invited him over for the holidays because he did not have family in town.

The town had problems with its water-meter reader, and it would occasionally overcharge residents for their usage. Hall complained to B.R. when he received several inaccurate water bills in 2013 and 2014. In an unrelated matter, in early August 2014, Hall's tomato and corn plants in his garden had been cut down, but the police department was not able to locate the responsible party; again, Hall complained to B.R.

On the evening of August 26, 2014, Hall had trouble falling asleep. He started looking through his bills and noticed that one of them was actually addressed to the city's post office. Thinking that B.R. was making him pay for the post office's bill, Hall made five calls to the city hall's telephone number over the course of one hour in the middle of the night. The five voicemails he left for B.R. are at the heart of this case.

Hall's first voicemail began with complaints about the mistreatment of neighborhood dogs. As the voicemail continues, his tone became increasingly hostile. He says that "this bullsh-t is going to come to an end." He tells B.R. that she is "done" and that the locals are waiting for someone like him to "step up to the plate and swing the bat." He adds, "Your bullsh-t is about to end." He then described rumors about how B.R. was kicked out of her house for being immoral and how her family had killed a man. He says that "things are going to happen around here real quick, real quick, all done." He ends the voicemail by insulting B.R.'s husband as a "fat mother f-cker." The first voicemail is 3 minutes and 25 seconds long and includes more than 20 expletives. In his second voicemail, made 16 minutes later, Hall insults B.R.'s intelligence and that of other people in town. He advises, "You don't wanna [sic] mess with me." He said, "I'm not from around here, but my peoples back there in the cities are going to make it happen." He ends this voicemail by telling her that it is "time for a wakeup call."

Hall left a third voicemail half an hour later. He told B.R. to resign the next day. He repeatedly warns her, "Don't test me, don't, just resign." He said that this is not a joke. He tells B.R. that State Auditor Rebecca Otto is now investigating B.R. and the town. He threatens physical violence against a neighbor, "You know what? That f-cking punk down

3

the road here . . . . Told him I'd knock his a-- out in front of everybody and pull his pants down and spank him like the b-tch that he is." He says his neighbor is "the f-cking problem. You're the problem too." Again, he demanded that she resign, that she's "done." He tells B.R., "If you think I am just bullsh-tting you [B.R.], see you don't know who my family is. Alright, I came here trying to be peaceful, not having problems with people, but for some reason you f-cking idiots around here wanna [sic] f-cking play games with people." He warns, "Don't play games with me." He ends the voicemail with, "You're gone, [B.R.], gone."

Several minutes later, in a fourth voicemail, Hall complains about the neighborhood dogs. In his fifth call, Hall again calls B.R. more insulting names and recommends that she call Rebecca Otto. He tells her to resign again, saying "You're all done." He calls her husband a "fat f-cking pig" and demands that she "get the f-ck out of our town."

The following morning, B.R. arrived at her office and listened to the messages. B.R. called the police, and Hall was charged with stalking for repeatedly making telephone calls, knowing that the conduct would cause the victim to feel frightened, threatened, persecuted, oppressed, or intimidated and, in fact, causes this reaction. *See* Minn. Stat. § 609.749, subds. 1, 2(4) (2014). Before trial, Hall moved to dismiss the charge for a lack of probable cause and on the ground that his voicemails were protected speech. The district court denied his motion, concluding that the voicemails were not protected speech and there was sufficient probable cause to support the charge.

At trial, B.R. testified that she was shocked and terrified because of the sound of his voice and the names she was called. She believed the voicemails were a definite threat

4

because Hall repeatedly said she was "done." After a jury trial, Hall was found guilty and sentenced to 37 months in prison.[1] This appeal follows.

## ISSUES

I.     Is Minnesota Statutes section 609.749, subdivision 2(4), unconstitutionally overbroad on its face?

II.    Is section 609.749, subdivision 2(4), unconstitutional as applied to Hall's five voicemails?

III.    Is there sufficient evidence to support Hall's conviction of stalking?

## ANALYSIS

Minnesota enacted its stalking statute in 1993, as an increasing number of stalking incidents resulted in high-profile, tragic murders across the country. 1993 Minn. Laws, ch. 326, art. 2, § 22 (codified at Minn. Stat. § 609.749 (1994)); *see State v. Orsello*, 554 N.W.2d 70, 71 (Minn. 1996) (noting that the murder of a celebrity by an obsessed fan precipitated a nationwide effort to enact stalking statutes), *superseded by statute on other grounds*, Minn. Stat. § 609.749, subd. 1a (1998); *see also* Cassandra Ward, *Minnesota's Anti-Stalking Statute: A Durable Tool to Protect Victims from Terroristic Behavior*, 12 J. L. & Ineq. 613, 633-34 (1994) (describing events surrounding statute's enactment). While the practice of stalking is centuries old, the crime itself is relatively new. Unlike crimes such as assault and battery, the crime of stalking did not exist at common law. 2 Wayne R. LaFave, *Substantive Criminal Law* § 16.4 (2d ed. 2016). But as stalking became an

---

[1] Although stalking is a gross misdemeanor, Hall was convicted of a felony because he had a previous stalking conviction. *See id.*, subd. 4(b) (elevating a subsequent offense to a felony if committed within ten years of a previous qualified domestic violence-related offense conviction).

escalating social problem in the 1990s, both state and the federal governments reacted. *Id.* They sought to provide law enforcement with a means to intervene before a stalker's actions resulted in injury or threat of death. *Id.*

Stalking is now a statutory crime in all 50 states, and interstate stalking is a federal crime. *See id.* at n.5 (citing to all state and federal stalking statutes).[2] These statutes addressed a troubling gap: the criminal justice system could not prosecute an individual whose conduct fell between harassment and terroristic threats. Karen A. Brooks, *The New Stalking Laws: Are They Adequate to End Violence?*, 14 Hamline J. Pub. L. & Pol'y 259, 259 (1993).

For a person to be convicted under Minnesota's stalking statute, the state must prove beyond a reasonable doubt that the individual engaged in conduct that the actor knows or has reason to know would cause the victim to feel frightened, threatened, persecuted, oppressed, or intimidated. Minn. Stat. § 609.749, subd. 1. The conduct must also cause

---

[2] California was the first state to enact a stalking law in 1990. Brooks, *supra*, at 259. A model stalking law was drafted in 1993. *See* Jennifer L. Bradfield, *Anti-Stalking Laws: Do They Adequately Protect Stalking Victims?*, 21 Harv. Women's L.J. 229, 246 n.86 (1998). Today, there are notable variations between stalking laws. Some laws make the offense a felony. *See, e.g.*, 18 U.S.C. §§ 2261(b)(5), 2261A (2012) (2012) (sentencing defendant whose conduct causes substantial emotional distress in a person across state lines to five years in prison). Other differences involve what conduct is necessary to constitute stalking. *See, e.g.*, Cal. Penal Code § 646.9(a) (West 2015) (requiring repeated conduct); Ark. Code Ann. § 5-71-229 (2016) (defining stalking as a course of conduct). Another distinction is the mental state required for the underlying conduct or the bad result caused. *See, e.g.*, Wis. Stat. Ann. § 940.32(2)(a) (2016) (intentional course of conduct), Alaska Stat. § 11.41.270(a) (2012) (a course of conduct that recklessly places another person in fear). The level of fear required for a conviction also varies. *See, e.g.*, Neb. Rev. Stat. § 28-311.02 (2016) (requiring the victim to actually feel stalked); Va. Code Ann. § 18.2-60.3.A (West 2016) (proscribing conduct intended to produce fear).

the victim to feel stalked; i.e., frightened, threatened, oppressed, persecuted or intimidated. *Id.* The statute then describes what conduct provides the basis for the crime of stalking; for example, repeatedly sending letters, following another person, or making a person's telephone continuously ring. *Id.*, subds. 2(2), (5)-(6) (2014). The type of conduct at issue here is repeatedly making telephone calls, regardless of whether a conversation ensues. *Id.*, subd. 2(4).

Hall challenges his conviction under Minnesota Statutes section 609.749, subdivision 2(4), arguing that it is unconstitutionally overbroad on its face and as applied because it restricts his First Amendment right of free speech. The constitutionality of a statute presents a question of law, which we review de novo. *State v. Bussmann*, 741 N.W.2d 79, 82 (Minn. 2007). A statute that restricts First Amendment rights is not presumed constitutional. *State v. Botsford*, 630 N.W.2d 11, 15 (Minn. App. 2001), *review denied* (Minn. Sept. 11, 2001). But "our power to declare a statute unconstitutional should be exercised with extreme caution and only when absolutely necessary." *In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989).

To address Hall's constitutional challenge, we first address whether the statute is unconstitutionally overbroad on its face. To do so, we initially examine whether subdivision 2(4) of the stalking statute implicates the First Amendment. If it does, we must determine whether it prohibits constitutionally protected activity in a substantial number of its applications. We then analyze whether the statute is unconstitutional as applied to Hall's conduct. Finally, we consider Hall's pro se argument that there is insufficient evidence to support his conviction. We address each issue in turn.

7

**I.      Minnesota Statutes section 609.749, subdivision 2(4), is not unconstitutionally overbroad on its face.**

The First Amendment to the United States Constitution provides "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I.  A statute that implicates speech under the First Amendment must not be overly broad.  *State v. Machholz*, 574 N.W.2d 415, 419 (Minn. 1998) (citing *City of Houston v. Hill*, 482 U.S. 451, 458, 107 S. Ct. 2502, 2508 (1987)).

Hall argues that criminalizing statements made over a telephone, either in the form of a call or text message, violates the First Amendment because it prohibits constitutionally protected speech.  The threshold inquiry involving a First Amendment overbreadth challenge is whether First Amendment concerns are actually implicated.  *State v. Stockwell*, 770 N.W.2d 533, 537 (Minn. App. 2009) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5, 104 S. Ct. 3065, 3069 n.5 (1984)), *review denied* (Minn. Oct. 28, 2009).  The party asserting First Amendment protection bears this initial burden because "to hold otherwise would be to create a rule that all conduct is presumptively expressive." *Id.* (quotation omitted).  If the First Amendment is implicated, we then analyze whether the statute would frequently intrude into areas of protected speech.  *Rew v. Bergstrom*, 845 N.W.2d 764, 778 (Minn. 2014).  When considering this question, we do so with the understanding that First Amendment protections extend not only to written or spoken words, but also to expressive activity because the activity itself may be communicative. *See Spence v. Washington*, 418 U.S. 405, 410-11, 894 S. Ct. 2727, 2730 (1974) (holding that affixing a peace symbol to a flag was protected expression).

The language of the stalking statute is broad enough to encompass speech. *See* Minn. Stat. § 609.749, subds. 1, 2(4) (defining stalking to include repeatedly making telephone calls or sending text messages that the actor knows or has reason to know would cause the victim to feel frightened, threatened, persecuted, oppressed, or intimidated, and causes this reaction on the part of the victim). The state points out that one may be prosecuted under the statute based upon making repeated "hang up" and "breather" calls, where there is no conversation but the defendant knew, or had reason to know, that these calls would cause the victim to feel frightened or intimidated. While this type of call is prohibited by the statute, the statute also applies to telephone *conversations*. Indeed, it applies to repeated text messages, which typically contain some expressive activity, whether words or a picture. Hall has met the threshold burden of demonstrating that First Amendment concerns are implicated in this case.

Having determined that the First Amendment is implicated by this provision of the stalking statute, we turn to the task of deciding whether it prohibits constitutionally protected activity in a substantial number of its applications, "judged in relation to the statute's plainly legitimate sweep." *Rew*, 845 N.W.2d at 778 (quoting *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1580 (2010)) (citation omitted).

The statute's language focuses primarily on conduct: repeatedly making telephone calls, sending text messages, or inducing a victim to make telephone calls to the actor. Minn. Stat. § 609.749, subd. 2(4). Because the statute also requires both intentional conduct and knowledge, or reason to know, that the conduct would cause the victim to feel frightened, we discern few situations in which constitutionally-protected speech would be

implicated under this statute.  Making a series of telephone calls by itself is not sufficient to establish stalking under the statute.  If that were the case, scores of telemarketing companies would be considered to have stalked millions of people on a daily basis.  Further, the statute does not regulate conduct that tends to merely annoy a person; it regulates conduct that causes a person to feel threatened, frightened, oppressed, persecuted, or intimidated.  *Id.*  In short, it requires actual harm.

In addition, the statute requires the actor to "know or have reason to know" that the conduct would cause this reaction on the part of the victim.  *Id.*  Because it includes a knowledge requirement on the part of the actor and a harm requirement on the part of the victim, it is highly unlikely that the statute would sweep a substantial number of constitutionally protected communications within its purview.

The limited examples of potentially protected speech offered by Hall do not persuade us otherwise.[3]  Hall argues that the statute infringes on the rights of employers, basketball coaches, and law professors who choose to place telephone calls to their employees, players, or students about their inadequate performance.  He further claims that the statute could apply to a mother sending two text messages to a son, threatening to withhold car privileges if homework remains undone.  He implies that an individual receiving these calls or texts may feel intimidated.  But, in his examples, Hall discounts the dual requirements of both *knowledge*, or reason to know, that such conduct would cause the victim to feel intimidated or frightened and actual *harm*.  While such phone calls are

---

[3] Most of Hall's examples are variations on examples provided in *Machholz*, 574 N.W.2d at 420-21.

possibly unexpected or annoying, a reasonable person receiving those calls would not feel stalked, nor would the caller expect that his or her call could cause that person to feel stalked. Further, the calls must be *repeated*, rather than isolated events. We do not discern that subdivision 2(4) would criminalize such innocuous phone calls.

We make this assessment that the statute will not frequently intrude upon First Amendment activity in light of the statute's legitimate public-safety goals. *See State v. Hensel*, 874 N.W.2d 245, 250 (Minn. App. 2016) (stating that to succeed in facial First Amendment challenge, a challenger must, among other items, establish that "the statute lacks any plainly legitimate sweep" (quotation omitted)), *review granted* (Minn. Apr. 19, 2016). The statute serves a significant state interest because it provides law enforcement officers with a means to intervene in dangerous situations before actual violence occurs. Ward, *supra*, at 616, 638.

Our holding in *State v. Stockwell*, in which we analyzed another provision of the stalking statute is instructive. 770 N.W.2d 533, 539-40. In *Stockwell*, we addressed the constitutionality of Minnesota Statutes section 609.749, subdivision 2(a)(2) (2006), which made it a crime if a person "stalks, follows, monitors, or pursues another" if the actor knows, or has reason to know, that the conduct would cause the victim to feel harassed. *Id.* (citing to the 2006 version of the statute, now renumbered as subdivision 2(2)). We determined that the provision was not unconstitutionally overbroad on its face because it is limited to the conduct proscribed, it requires the actor to know that his or her conduct

11

will cause fear and does cause that reaction, and it is subject to a limiting construction.[4] *Id.* (citing *Dunham v. Roer*, 708 N.W.2d 552, 566 (Minn. App. 2006) (stating that the harassment-restraining-order statute regulates only fighting words, true threats, or substantial invasions of one's privacy because it requires both repeated unwelcome acts and "a substantial adverse effect on the safety, security, or privacy of another"), *review denied* (Minn. Mar 28, 2006)).

Hall contends that *State v. Machholz* compels that we conclude that the stalking statute is facially overbroad. 574 N.W.2d at 418. We disagree. In *Machholz*, the Minnesota Supreme Court invalidated a now repealed catch-all provision of this statute which made it a crime for a person to engage "in any other harassing conduct that interferes with another person or intrudes on the person's privacy or liberty." *Id.* (citing Minn. Stat. § 609.749, subd. 2(7) (1996)).[5] The defendant in *Machholz* was charged with felony harassment after he rode his horse through a group of people gathered to celebrate an annual event for homosexuals. He yelled, "You're giving us AIDS!"; "You're spreading your filth!"; "There are no homosexuals in heaven!"; and "You're corrupting our children!" *Id.* at 422. Addressing the defendant's argument that the statute was overbroad as applied, the court in *Machholz* noted that commenting on matters of public concern in public arenas

---

[4] We acknowledged in *Stockwell* that subdivision 2(a)(2) was subject to a limiting construction which emphasized that the provision does not impair speech and gave specific examples. *Id.* at 540 (citing to Minn. Stat. § 609.749, subd. 7 (2006)).

[5] After *Machholz*, in 2010, the legislature amended the statute by changing the word "harassment" to "stalking." 2010 Minn. Laws, ch. 299, § 8, at 740 (codified at Minn. Stat. § 609.749, subd. 1 (2010)). The definition of "stalking" has not changed since 2010. *Compare id.*, *with* Minn. Stat. § 609.749, subd. 1.

12

is "at the heart of the First Amendment." *Id.* at 422 (quotation omitted). It held that the broad reach of the statutory language, which referred to "any other harassing conduct," swept a "whole spectrum of constitutionally protected activity" within the purview of the statute and, as such, the degree of overbreadth was substantial. *Id.* at 420.

Unlike the general catchall provision in *Machholz*, which was decidedly more expansive because it encompassed any and all harassing conduct, subdivision 2(4) is narrower. *Compare id.* at 418, *with* Minn. Stat. § 609.749, subd. 2(4). It focuses only on repeatedly making telephone calls or text messages which the caller knows or has reason to know would cause the victim to feel frightened, threatened, oppressed, or intimidated. Minn. Stat. § 609.749, subd. 1; *see Stockwell*, 770 N.W.2d at 539 (stating that "[t]his redrawn statute balances the security and privacy rights of the victim against the harasser's right to communicate.").

Finally, we also note that, like our decision in *Stockwell* upholding a similar provision of Minnesota's stalking law, many appellate courts have also issued decisions upholding the constitutionality of stalking statutes across the country. *See, e.g.*, *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014); *United States v. Sayer*, 748 F.3d 425 (1st Cir 2014); *Wisconsin v. Ruesch*, 571 N.W.2d 898, 904 (Wis. Ct. App. 1997); *People v. White*, 536 N.W.2d 876, 883-84 (Mich. Ct. App. 1995); *Bouters v. Florida*, 659 So. 2d 235, 237 (Fla. 1995); *Johnson v. State*, 449 S.E.2d 94, 96-97 (Ga. 1994). *But see Oregon v. Norris-Romine*, 894 P.2d 1221, 1224-25 (Or. Ct. App. 1995), *review denied* (Or. Aug. 22, 1995).

13

As the Eighth Circuit Court of Appeals stated when upholding the constitutionality of the interstate stalking statute, "[a]n overbreadth challenge . . . will rarely succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012) (quotation omitted). This provision of Minnesota's stalking law is not that rare case. Although it implicates the First Amendment, its language focuses primarily on conduct, and it is unlikely that this statute would sweep a substantial number of constitutionally protected communications within its purview. But in the exceptional case where the statute applies to protected speech, its overbreadth may be remedied through an as-applied First Amendment challenge. Given the legitimate goals and applications of this provision of the stalking statute, Hall has not met the heavy burden of showing that it is unconstitutionally overbroad on its face.

II. **Minnesota Statutes section 609.749, subdivision 2(4), is not unconstitutional as applied to Hall.**

We next consider whether the state applied the stalking statute against Hall in an unconstitutional manner. Hall contends that applying the statute to his five voicemails, when he intended only to voice frustration with the town's administration, infringes on his right to free speech as protected by the First Amendment. A statute is unconstitutionally overbroad as applied if it prohibits constitutionally protected activity in the particular context of the facts and circumstances of the case. *Rew*, 845 N.W.2d at 780. The state argues that because Hall's voicemails are "fighting words," which have no First

14

Amendment protection, the statute does not prohibit constitutionally protected activity as applied to Hall.

The right to free speech is not absolute. As the United States Supreme Court stated in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 769 (1942) [6]:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.

Certainly, speech must do more than cause hurt feelings, offense or resentment in order to fit into the narrow category of speech excluded from First Amendment protection. But true threats do not enjoy First Amendment protection. *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 1548 (2003) (defining true threats as statements where the speaker communicates "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"). The First Amendment also permits restrictions on fighting words. *Chaplinsky*, 315 U.S. at 572-73, 62 S. Ct. at 769.

Here, given the threats and obscenities which permeate the five voicemails, Hall's messages fall outside the realm of protected speech. While Hall may have intended merely to express frustration with the government, the nature of his statements amounts to personal

---

[6] As the Supreme Court noted in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383, 112 S. Ct. 2538, 2543 (1992), decisions since the 1960s have narrowed the scope of the categorical exceptions for defamation and obscenity, but "a limited categorical approach has remained an important part of our First Amendment jurisprudence."

15

abuse.[7]  Hall made derogatory references to B.R.'s personal character, her family, and her intelligence.  He threatened two of his neighbors with physical violence.  He demanded that B.R. resign.  He also threatened an investigation from State Auditor Rebecca Otto.  He referred to his people in the Twin Cities and said, "[a]ll I do is call them, you understand what I'm saying?  Capisce?"  He warned B.R. not to test him.  He said B.R. is part of the problem.  He told her that she is done.  He demanded that she leave town.  And he laced all these comments with expletives.  As the district court held, in concluding that there was probable cause to support the charge against Hall, a reasonable recipient would interpret Hall's statements as a serious expression of an intent to harm or cause injury to another.

In *State v. Andersen*, we concluded that less hostile and threatening statements were unprotected speech.  370 N.W.2d 653, 661 (Minn. App. 1985).  The defendant in *Andersen* accused the victim of breaking the law, threatened the victim with legal action, and made derogatory comments about the victim receiving welfare and living in subsidized housing.  *Id.* at 658, 661.  We determined that the defendant's statements did not constitute protected speech.  *Id.* at 661.  Similarly, we struggle to find protected speech here, given the vulgar and personal nature of Hall's statements.

---

[7] In his pro se brief, Hall argues that the statute also infringes upon his right to petition the government, which also enjoys First Amendment protection.  But it does not follow that such a right was intended to provide immunity from threats, fighting words, or harassing government employees.  *See McDonald v. Smith*, 472 U.S. 479, 484, 105 S. Ct. 2787, 2790-91 (1985) (naming examples not immunized by the right to petition, e.g., defamation, libel, and baseless litigation).  Because Hall's voicemails are not protected speech, as described above, they do not entitle Hall to First Amendment protection under the right to petition the government.

Threats and obscenities are not invisible to the Constitution. *R.A.V.*, 505 U.S. at 383, 112 S. Ct. at 2543. We are mindful that "a particular instance of speech can be proscribable on the basis of one feature (e.g., obscenity) but not on the basis of another (e.g., opposition to the city government)." *Id.* at 385, 112 S. Ct. at 2544; *see Machholz,* 574 N.W.2d at 422 (statements that were offensive and obnoxious were not *per se* "fighting words" when commenting on matters of public concern). But we do not discern that Hall's messages touch upon matters of public concern. His statements were about his neighbors, the local dogs, and B.R.'s family members. Hall did not discuss politics, local news, or current events; nothing in his messages relates to an issue that is important to the general public or the community. Unlike the statements in *Machholz*, which concerned the defendant's personal beliefs on homosexuality and were directed toward no particular person, Hall's statements did not contribute to the free exchange of ideas and were directed at only one person. *See Machholz*, 574 N.W.2d at 422. Further, Hall's statements were not made in a public forum such as a street, sidewalk or modern-day equivalent of a soapbox. Unlike the defendant's statements in *Machholz*, which were made in a public park, here, Hall's voicemails were left on B.R.'s city-hall telephone in the middle of the night. *Id.* They were made in personal voicemails intended for B.R.

As applied, Hall's repeated telephone calls and the content in his messages lie precisely within the realm of conduct that the state is authorized to regulate. The intimidating nature of Hall's voicemail messages, laced with threats and vulgarities, caused B.R. to fear for her safety. Given this content, the private nature of his statements, and the

17

non-public forum, Hall's voicemails are not entitled to First Amendment protection. Subdivision 2(4) of the stalking law is not unconstitutional as applied to Hall.

### III.    There was sufficient evidence to convict Hall of stalking.

In a pro se supplemental brief, Hall properly raises the additional issue of whether there is sufficient evidence to support his conviction.[8]  Hall contends that the state failed to prove beyond a reasonable doubt that he knew or should have known that the *repetitive* nature of the five voicemails would have caused B.R. to feel frightened, threatened, oppressed, persecuted or intimidated.  Similarly, he argues that the fact that there were five messages instead of one "did not convey to [B.R.] anything that would reasonably frighten, threaten, oppress, persecute or intimidate her."  He points to B.R.'s trial testimony that she believed statements in the voicemails to be scary and threatening, and that she was "shocked and terrified," but argues that she did not testify that she was frightened by the number of voicemails.

Hall misunderstands the gravamen of the proof necessary for a stalking conviction under subdivision 2(4).  While a defendant's conduct must include repeatedly making telephone calls, in assessing whether the calls caused B.R. to be frightened, threatened, oppressed, persecuted or intimidated, all the attributes of the telephone calls are considered. *See State v. Schweppe*, 306 Minn. 395, 399, 237 N.W.2d 609, 613 (1975) (explaining that

---

[8] In his pro se brief, Hall argues that his voicemails were protected under the First Amendment's right to petition the government, which we address in Section II, *supra*.  He further challenges subdivision 2(4) of the stalking statute as unconstitutionally vague in violation of the due process clause of the Fifth and Fourteenth Amendments.  Because this argument was not presented to and considered by the district court, we do not consider it here. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988).

words must be considered in light of the context in which they were used to assess whether they were threatening). In short, the content of the calls, not the repeated nature of the calls alone, appropriately demonstrates that the calls induced fear or intimidation on the part of the victim.

Here, the content of the voicemails and B.R.'s testimony provide sufficient evidence to prove beyond a reasonable doubt both that Hall knew or had reason to know that his conduct would cause B.R. to feel frightened, threatened, oppressed, persecuted, or intimidated; and that B.R., indeed, felt this way. Hall's knowledge of the harassing nature of his telephone calls can be inferred from the content of the voicemail messages. They were personal, often vulgar, and contained veiled threats. And B.R. testified that she "ha[d] never been so threatened" and was still frightened. A review of her testimony indicates that her fear escalated as she listened to the repeated telephone calls. There is sufficient evidence from which a jury could reasonably conclude that Hall knew or should have known that his voicemails were frightening and threatening and that they had that precise effect on B.R.

## DECISION

Because Minnesota Statutes section 609.749, subdivision 2(4), is not unconstitutionally overbroad on its face or as applied in violation of the First Amendment, and because there is sufficient evidence to support the stalking conviction, we affirm Hall's conviction of stalking.

**Affirmed.**

19