WORKE, Judge
Appellant argues that his adjudications for stalking and harassment must be reversed because (1) Minn. Stat. §§ 609.749, subd. 2(6), and .795, subd. 1(3), are unconstitutionally overbroad both facially and as applied, and (2) the evidence was insufficient to prove his guilt beyond a reasonable doubt. We affirm.
FACTS
In March 2016, high school students, W.K., B.L., and appellant A.J.B., discussed that M.B., a fellow student who had been diagnosed with autism and ADHD, had recently posted some tweets discussing girls at school. B.L. and A.J.B. told W.K. that they wanted to post materials on M.B.'s Twitter page to elicit a "negative response." A.J.B. created a Twitter account with no identifying information called "Jeb Bush's Guac Bowl." A.J.B. then began tweeting messages tagging M.B.'s account over two to three hours, with several referring to autism. One post contained a sign saying "Autistic Children Play Here" with a caption reading "Meanwhile at [M.B.]'s Daycare." Another post contained a checkerboard of images with M.B.'s face and a caption reading "Click the Autistic Child." Another post encouraged M.B. to "try a new cologne called 'Anthrax.' " One post encouraged M.B. to "consider suicide," while another contained an image stating "Consider the following" with a picture of a person holding a Clorox Bleach bottle. A.J.B. also posted an image of Pepe the Frog, "a known hate symbol," hanging by the neck on a rope.
Several days later, the tweets came to the attention of the high school's dean of students. She spoke to M.B. and asked if he had seen anything online that made him concerned. M.B. told her that he had not checked his Twitter account for several days. After the dean of students investigated and learned that W.K., B.L., and A.J.B. were involved, she spoke to A.J.B., who admitted to posting the tweets.
Later that afternoon, when M.B. looked at the tweets, he immediately became upset and cried. M.B. testified that the tweets made him want to commit suicide and that he held a knife near his chest. M.B. decided not to commit suicide and called his mother. M.B. testified that when he returned to school, he was afraid that someone was going to attack him. M.B.'s mother took him to see a psychiatrist and a social worker because she was afraid that M.B. would try to hurt himself.
A.J.B. was charged with gross-misdemeanor stalking and misdemeanor harassment. A.J.B. moved to dismiss, but the district court denied the motion, ruling that the stalking and harassment statutes were constitutional, both facially and as applied to A.J.B. The state later amended the juvenile petition, adding the charge of felony stalking because of disability.
*496 After a trial, the district court concluded that the state proved each count of the petition beyond a reasonable doubt. The district court adjudicated A.J.B. delinquent on the gross-misdemeanor stalking and misdemeanor harassment charges, but stayed adjudication on the felony stalking charge. This appeal followed.
ISSUES
I. Did the district court err by determining that the stalking and harassment statutes were not facially overbroad?
II. Did the district court err by determining that the stalking and harassment statutes were not overbroad as applied to appellant's specific conduct?
III. Did the district court fail to hold the state to its burden of proof?
IV. Was the evidence sufficient to support the district court's finding of guilt on the felony stalking charge?
ANALYSIS
First Amendment
A.J.B. argues that the stalking and harassment statutes are unconstitutionally overbroad, both facially and as applied to his conduct.[1] This court reviews the constitutionality of a statute de novo. State v. Bussmann , 741 N.W.2d 79, 82 (Minn. 2007). While statutes that restrict First Amendment rights are not presumed constitutional, this court should declare a statute unconstitutional only when absolutely necessary. State v. Hall , 887 N.W.2d 847, 852 (Minn. App. 2016), review denied (Minn. Feb. 22, 2017).
Facial challenge
The United States and Minnesota Constitutions protect the freedom of speech. U.S. Const. amend. I ; Minn. Const. art. I, § 3 ; State v. Wicklund , 589 N.W.2d 793, 801 (Minn. 1999) (interpreting the Minnesota Constitution's free-speech provision as equivalent to the First Amendment to the U.S. Constitution). "A statute that implicates speech under the First Amendment must not be overly broad." Hall , 887 N.W.2d at 852. A statute is overbroad "if it prohibits or chills a substantial amount of protected speech along with unprotected speech." State v. Crawley , 819 N.W.2d 94, 102 (Minn. 2012).
To succeed in a facial overbreadth challenge, "the challenger must establish that a substantial number of [a statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." State v. Hensel , 901 N.W.2d 166, 170 (Minn. 2017) (quotation omitted). First, this court must determine whether First Amendment concerns are implicated. State v. Stockwell , 770 N.W.2d 533, 537 (Minn. App. 2009). If a statute implicates the First Amendment, this court must decide "whether it prohibits constitutionally protected activity in a substantial number of its applications." Hall , 887 N.W.2d at 852. "[B]ecause the overbreadth doctrine has the potential to void an entire statute, it should be applied only as a last resort." Stockwell , 770 N.W.2d at 538 (quotations omitted).
To convict A.J.B. under the stalking statute, the state had to prove beyond a *497 reasonable doubt that he "repeatedly mail[ed] or deliver[ed] or cause[d] the delivery by any means, including electronically, of letters, telegrams, messages, [or] packages" which he knew or had reason to know "would cause the victim under the circumstances to feel frightened, threatened, oppressed, persecuted, or intimidated, and cause[d] this reaction on the part of the victim regardless of the relationship between the actor and victim." See Minn. Stat. § 609.749, subds. 1, 2(6) (2014). To convict A.J.B. of harassment, the state had to prove that he, "with the intent to abuse, disturb, or cause distress, repeatedly mail[ed] or deliver[ed] or cause[d] the delivery by any means, including electronically, of letters, telegrams, or packages." See Minn. Stat. § 609.795, subd. 1(3).
Implicates First Amendment
The state does not contest that both statutes implicate the First Amendment. In Hall , this court held that a different subdivision of the stalking statute relating to repeated phone calls and text messages implicated the First Amendment because phone calls and text messages "typically contain some expressive activity, whether words or a picture." 887 N.W.2d at 853. In Stockwell , this court held that Minn. Stat. § 609.749, subd. 2(a)(2) (2006)-the stalking statute-implicated the First Amendment as well, despite its focus on particular forms of harassing conduct, because that statute could have impacted expressive conduct. 770 N.W.2d at 538. Here, although the statutes focus on particular forms of stalking or harassing conduct, the conduct criminalized by those statutes involves sending letters, telegrams, messages, or packages, each of which typically involves some expressive activity. Because the statutes in this case may implicate expressive activity, we conclude that they implicate the First Amendment.
Prohibits protected speech
A.J.B. argues that the stalking and harassment statutes prohibit a substantial amount of protected speech, relying primarily on Hensel and State v. Machholz , 574 N.W.2d 415 (Minn. 1998). We are not persuaded. In Hensel , the supreme court held that Minn. Stat. § 609.72, subd. 1(2) (2016), the disorderly conduct statute, was substantially overbroad on its face. 901 N.W.2d at 170, 175. The supreme court read that statute as prohibiting "any activity, whether expressive or not, that interferes with or destroys the tranquility of any lawful gathering of people ... so long as the individual knows, or has reason to know, that the activity will, or will tend to, disturb others." Id. at 172 (quotations omitted). The supreme court noted the "alarming breadth" of the statute, which criminalized protected speech such as criticizing political groups, wearing clothes bearing offensive inscriptions, and burning the American flag on a public street. Id. (quotation omitted).
In Machholz , the supreme court held that Minn. Stat. § 609.749, subd. 2(7) (1996), which criminalized "harassing conduct that interferes with another person or intrudes on the person's privacy or liberty," was substantially overbroad on its face. 574 N.W.2d at 418, 421. The supreme court noted that statute's language "swe[pt] in a whole spectrum of constitutionally protected activity." Id. at 420.
In Hall , this court distinguished subdivision 2(4) of the stalking statute from the catchall provision in Machholz , reasoning that, unlike the catchall provision that "encompassed any and all harassing conduct, subdivision 2(4) is narrower." 887 N.W.2d at 855. This court also noted that subdivision 2(4) focused only on repeated conduct which the caller knew or had reason to know would cause the victim to feel frightened, *498 oppressed, or intimidated. Id. In Stockwell , this court distinguished Machholz as well, noting that, unlike the catchall harassment language in Machholz , the statute before the court was limited to the specific conduct of "stalking, following, monitoring, or pursuing." 770 N.W.2d at 539.
The subdivisions of the stalking and harassment statutes at issue here bear greater similarity to those in Hall and Stockwell than to those in Machholz and Hensel . Like the statutes in Hall and Stockwell , the stalking statute here refers to specific conduct-mailing or delivering something to the victim. See Minn. Stat. § 609.749, subd. 2(6). Similarly, the harassment statute outlaws the mailing or delivering of letters, telegrams, or packages. Minn. Stat. § 609.795, subd. 1(3). Furthermore, both statutes refer only to repeated conduct. Id. ; Minn. Stat. § 609.749, subd. 2(6). Finally, as this court noted in Stockwell , the stalking statute additionally requires that the offender "knows or has reason to know [the conduct] will cause the victim ... to feel frightened, threatened, oppressed, persecuted, or intimidated and actually causes this reaction." 770 N.W.2d at 539 (quotation omitted); see also Hall , 887 N.W.2d at 855 (concluding that subdivision 2(4) is not facially overbroad, in part, because it is limited to conduct that "the caller knows or has reason to know would cause the victim to feel frightened, threatened, oppressed, or intimidated").
Because the stalking and harassment statutes penalize only specific, repeated conduct done with intent, knowledge, or reason to know that the conduct will elicit a particular response, we conclude that these statutes are not facially overbroad.
As-applied challenge
A.J.B. argues that the stalking and harassment statutes are unconstitutionally overbroad as applied to his specific conduct. "A statute is unconstitutionally overbroad as applied if it prohibits constitutionally protected activity in the particular context of the facts and circumstances of the case." Hall , 887 N.W.2d at 856 (citing Rew v. Bergstrom , 845 N.W.2d 764, 780 (Minn. 2014) ). "[F]acial and as-applied challenges differ in the showing required to invalidate a statute, not in the underlying substantive standard that applies to each type of challenge." Rew , 845 N.W.2d at 778.
A.J.B. compares sending a tweet to passing out flyers and posting information on a bulletin board. See Lovell v. City of Griffin , 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938) (stating that the liberty of the press "necessarily embraces pamphlets and leaflets" and that "[l]iberty of circulating is as essential to that freedom as liberty of publishing"). A.J.B. also argues that his actions did not constitute fighting words or true threats. See Hensel , 901 N.W.2d at 171 (listing fighting words and true threats as categories of unprotected speech). In response, the state argues that A.J.B.'s statements are entitled to diminished First Amendment protection because Twitter is not a public forum, his statements were threatening, and his speech was integral to criminal conduct.
In the context of an as-applied challenge, the initial question is whether A.J.B.'s actions constitute expressive activity under the First Amendment. See Machholz , 574 N.W.2d at 421 (stating that the initial step in the as-applied challenge analysis is determining whether the appellant's "actions, combined with his speech, constitute expressive activity under the First Amendment"); Hall , 887 N.W.2d at 856 (considering, in the context of the appellant's as-applied challenge, whether his harassing and threatening voicemails constituted constitutionally protected activity).
*499 In Machholz , the supreme court determined that the appellant's conduct of riding a horse through a crowd while shouting "You're giving us AIDS!" and "You're spreading your filth!" constituted expressive activity. 574 N.W.2d at 418, 421. The supreme court stated that, although in some cases it is possible to separate protected speech from unprotected conduct, the court could not do so in Machholz because "[t]he words used by [the appellant were] inextricably linked to the conduct of riding his horse through the crowd." Id. at 421. The supreme court reached this conclusion because the court found it "difficult to believe that [the appellant] would have been charged under [the harassment] statute had he simply ridden through the crowd without saying a word." Id.
Here, it is similarly difficult to believe that A.J.B. would have been charged with either stalking or harassment if he had posted numerous tweets tagging M.B. with no content. As the district court noted, A.J.B.'s "posts are cruel and go beyond any measure of human decency. They barrage a disabled young man who already suffers on numerous fronts with demeaning messages both directly and publicly." We conclude that A.J.B.'s conduct of sending messages to M.B. is inextricably intertwined with the content of the messages and that A.J.B. engaged in expressive conduct. Therefore, we must consider whether A.J.B.'s actions were constitutionally protected.
Public forum
A.J.B. argues that sending an offensive tweet is comparable to posting an offensive message on a bulletin board-an act that would likely be protected by the First Amendment. See Lovell , 303 U.S. at 452, 58 S.Ct. at 669. A.J.B. relies on United States v. Cassidy , in which a federal district court concluded that tweets directed toward a "well-known religious figure" were protected by the First Amendment. 814 F.Supp.2d 574, 583 (D. Md. 2011). The court in Cassidy reasoned that "Twitter and Blogs are today's equivalent of a bulletin board that one is free to disregard, in contrast, for example, to emails or phone calls directed to a victim." Id. at 585-86. The court concluded that the tweets were protected speech because the victim was a "well-known religious figure," the tweets challenged the victim's "character and qualifications as a religious leader," and "anonymous, uncomfortable Internet speech addressing religious matters" is protected by the First Amendment. Id. at 583.
Unlike Cassidy , there is no contention that M.B. is a public figure or that A.J.B.'s speech related to religious matters. Furthermore, Cassidy did not discuss the impact of tagging a specific Twitter user in a tweet. The Cassidy court contrasted a tweet with "a telephone call, letter or e-mail specifically addressed to and directed at another person" and explained that this difference "is fundamental to the First Amendment analysis in th[e] case." Id. at 578. Here, the evidence showed that by tagging M.B.'s Twitter account, the user posting the tweets intended that the tweets would be seen by the tagged individual as well as being viewable by the Twitter community at large. As one witness testified, although tweets tagging a specific Twitter user are still public, the act of tagging someone means that the messages are "on their wall. Anyone can see it but [the poster is] just making sure that the [tagged] person sees it."
M.B. testified that he saw the tweets because his username had been tagged. Based on the evidence, we conclude that tweets tagging a specific individual are both public and specifically targeted because the act of tagging someone is intended *500 so that the tagged individual sees the posts. Therefore, A.J.B.'s comparison to posting information on a bulletin board is misplaced and his actions are not entitled to greater protection merely because they were visible to the public.
Unprotected speech
The parties disagree as to whether A.J.B.'s actions fell within a category of unprotected speech. Certain categories of speech are "of such slight social value as a step to truth that any benefit that may be derived from [them is] clearly outweighed by the social interest in order and morality." State v. Washington-Davis , 881 N.W.2d 531, 538 (Minn. 2016) (quotation omitted). These categories include fighting words, true threats, and speech integral to criminal conduct. Hensel , 901 N.W.2d at 171 ; State v. Muccio , 890 N.W.2d 914, 923 (Minn. 2017), cert. denied , --- U.S. ----, 138 S.Ct. 328, 199 L.Ed.2d 212 (2017).
The state asserts that the content of A.J.B.'s tweets was unprotected speech integral to criminal conduct. We agree. The First Amendment does not protect " 'speech or writing used as an integral part of conduct in violation of a valid criminal statute.' " Washington-Davis , 881 N.W.2d at 538 (quoting Giboney v. Empire Storage & Ice Co. , 336 U.S. 490, 498, 69 S.Ct. 684, 688, 93 L.Ed. 834 (1949) ). "This exception to the First Amendment has been and remains controversial; its boundaries and underlying rationale have not been clearly defined, leaving the precise scope of the exception unsettled." United States v. Osinger , 753 F.3d 939, 950 (9th Cir. 2014) (Watford, J., concurring) (citing Eugene Volokh, Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones , 90 Cornell L. Rev. 1277, 1311-26 (2005) ).
This exception was examined by the Supreme Court in Giboney , in which the Court considered whether a Missouri statute violated the First Amendment as applied to peaceful picketing by union members. 336 U.S. at 491-92, 495, 69 S.Ct. at 685, 687. The picketers argued that an injunction against picketing abridged their right to free speech because they were attempting to peacefully publicize facts about a labor dispute. Id. at 497-98, 69 S.Ct. at 688. The Supreme Court disagreed, noting that the picketers' activities, including patrolling, forming a picket line, and publicizing the protest, "constituted a single and integrated course of conduct" in violation of Missouri law. Id. at 498, 69 S.Ct. at 688. The Court reasoned that "placards used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control." Id. at 502, 69 S.Ct. at 690. The Court also noted that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Id. , 69 S.Ct. at 691.
In Osinger , the Ninth Circuit Court of Appeals considered an appellant's as-applied challenge to the federal stalking statute. 753 F.3d at 940, 946. The appellant was convicted of engaging in a course of harassing and intimidating conduct, including sending threatening and sexually explicit text messages, emails, and photographs. Id. at 941-42. The Ninth Circuit determined that the appellant "engaged in a course of conduct with the intent ... to ... harass" and that "[a]ny expressive aspects of [his] speech were not protected under the First Amendment because they were integral to criminal conduct in intentionally harassing" the victim. Id. at 947 (quotations omitted).
*501 Similarly, in United States v. Petrovic , the defendant was convicted of interstate stalking for sending the victim text messages threatening to reveal sexually explicit images of her and then mailing postcards containing a sexually explicit image, abusive language, and directions to a website containing dozens of other images and personal information. 701 F.3d 849, 852-53 (8th Cir. 2012). The Eighth Circuit rejected the appellant's as-applied challenge "[b]ecause [his] harassing and distressing communications were integral to his criminal conduct of extortion" and were therefore not protected by the First Amendment. Id. at 855.
Finally, in United States v. Shrader , the appellant made harassing phone calls and sent harassing and threatening letters to the victim. 675 F.3d 300, 304 (4th Cir. 2012). The Fourth Circuit rejected the appellant's as-applied challenge, noting that the federal stalking statute clearly proscribed the appellant's "harassing and intimidating" conduct and that the appellant's "own words evince his intent to cause substantial emotional distress." Id. at 312 (quotation omitted).
These cases demonstrate that engaging in a pattern of harassing conduct is not protected by the First Amendment simply because it is carried out by means of speech. Here, both of the statutes criminalize the conduct of stalking or harassment. The stalking statute outlaws the acts of mailing, delivering, or causing the delivery of letters or messages "which the actor knows or has reason to know would cause the victim under the circumstances to feel frightened, threatened, oppressed, persecuted, or intimidated." Minn. Stat. § 609.749, subds. 1, 2(6). Similarly, the harassment statute criminalizes mailing, delivering, or causing the delivery by any means, including electronically, of letters "with the intent to abuse, disturb, or cause distress." Minn. Stat. § 609.795, subd. 1(3). The fact that A.J.B. engaged in this conduct in part by means of speech does not entitle this activity to First Amendment protection. The fact that speech was employed as the mechanism for causing the victim distress does not insulate the actor from punishment if the speech was integral to the commission of the crime itself. Because A.J.B.'s speech was integral to criminal conduct, we conclude that these statutes are not unconstitutionally overbroad as applied to this case. We therefore decline to consider whether A.J.B.'s speech was proscribable as either fighting words or true threats.
Burden of proof
A.J.B. argues that the district court erred by failing to hold the state to its full burden at trial. We review questions regarding the applicable burden of proof de novo. Genung v. Comm'r of Pub. Safety , 589 N.W.2d 311, 313 (Minn. App. 1999), review denied (Minn. May 18, 1999).
A.J.B. argues that because he raised constitutional protection as an affirmative defense, the state had to prove at trial that his acts were not constitutionally protected. Specifically, he argues that the savings clause of the stalking statute imposes a burden on the state to prove beyond a reasonable doubt that the charged conduct is not constitutionally protected.
Minnesota Statutes section 609.749, subdivision 7 (2014), provides that "[c]onduct is not a crime under this section if it is ... authorized, required, or protected by ... the state, federal, or tribal constitutions." In Machholz , the supreme court briefly discussed this "savings clause" and agreed that "a general savings provision cannot substantively operate to save an otherwise invalid statute, since it is a mere restatement of well-settled constitutional restrictions on the construction of statutory *502 enactments." 574 N.W.2d at 421 n.4 (quotation omitted). The supreme court cited Long v. State , a 1996 decision in which a Texas appellate court confronted an argument similar to A.J.B.'s. 931 S.W.2d 285, 294 (Tex. Crim. App. 1996). The Texas court reasoned that a savings provision "would permit the defendant to introduce evidence before the jury regarding the constitutional nature of his conduct," which would "relegate the First Amendment issue to a case-by-case adjudication, creating another vagueness problem." Id. at 295 (quotation omitted). The Texas court also noted that "[a]pplication of the affirmative defense ... on a case-by-case basis would require people of ordinary intelligence-and law enforcement officials-to be First Amendment scholars." Id.
As the supreme court noted in Machholz , the savings provision is merely a restatement of well-settled law. 574 N.W.2d at 421 n.4. Thus, we conclude that the savings provision does not create an additional affirmative duty on the state to present evidence at trial concerning a statute's constitutionality. If a district court determined, as a matter of law, that the stalking statute infringed on free speech, the district court could not find, in its role as fact-finder, that a defendant violated that statute. We conclude that the state did not bear the burden at trial to prove beyond a reasonable doubt that A.J.B.'s activity was not protected by the state or federal constitutions.
Sufficiency of the evidence
A.J.B. also argues that the evidence was insufficient to support a finding of guilt for the felony stalking charge. Specifically, he argues that the state failed to prove that he targeted M.B. because of his disability.
On appeal from a determination that each element of a delinquency petition has been proved beyond a reasonable doubt, "an appellate court is limited to ascertaining whether, given the facts and legitimate inferences, a fact-finder could reasonably make that determination." In re Welfare of T.N.Y. , 632 N.W.2d 765, 768 (Minn. App. 2001) (quotation omitted). This court assumes that the fact-finder believed the state's witnesses and disbelieved contrary evidence. Id. The district court's factual findings are upheld unless clearly erroneous. In re Welfare of M.E.M. , 674 N.W.2d 208, 215 (Minn. App. 2004). A person is guilty of felony stalking if he "commits any [stalking] offense ... because of the victim's or another's actual or perceived ... disability." Minn. Stat. § 609.749, subd. 3(a)(1) (2014).
Here, W.K. testified that some of the tweets were directed towards M.B.'s autism. The record demonstrates that several of the tweets specifically referred to M.B.'s autism. Although A.J.B. testified that he did not know that M.B. was autistic when he sent the tweets and that he used the term "autistic" synonymously with "out of place," the district court determined that A.J.B.'s testimony was not credible. On this record, we conclude that the evidence was sufficient to find beyond a reasonable doubt that A.J.B. stalked M.B. because of his disability.
DECISION
Because Minn. Stat. §§ 609.749, subd. 2(6), and .795, subd. 1(3), are not unconstitutionally overbroad, either facially or as applied to the facts of this case, the district court did not err by denying A.J.B.'s motion to dismiss. Furthermore, because Minn. Stat. § 609.749, subd. 7, does not impose an affirmative duty on the state to present evidence at trial of a statute's constitutionality, the district court did not fail to hold the state to its burden of proof. Finally, there was sufficient evidence to *503 support a finding of guilt for the felony stalking charge.
Affirmed.

A.J.B. argues that the statutes are unconstitutionally vague as well. However, besides briefly describing the void-for-vagueness doctrine, A.J.B. cites no caselaw supporting his vagueness argument. Issues not briefed on appeal are not properly before this court. See McKenzie v. State , 583 N.W.2d 744, 746 n.1 (Minn. 1998) (declining to address issues that the appellant alluded to but failed to address in the argument portion of his brief). Therefore, we decline to consider whether the stalking and harassment statutes are unconstitutionally vague.